# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| KENNETH M. LIPMAN, EDDIE WEBB, BINYAM GHEBREGHIORGIS, SCOTT HOLLANDER and MARK CASWELL, on behalf of themselves and the Terex Corporation and Affiliates' 401(k) Retirement Savings Plan, and/or alternatively on behalf of a class consisting of similarly situated participants and beneficiaries of the Plan,<br><br>        Plaintiffs,<br><br>v.<br><br>TEREX CORPORATION, THE ADMINISTRATIVE COMMITTEE OF THE TEREX CORPORATION AND AFFILIATES' 401(k) RETIREMENT SAVINGS PLAN, PHILLIP C. WIDMAN, CHARLES SNAVELY, KEVIN A. BARR, ERIC I. COHEN, TRICIA E. POLE, ROBERT K. BROWN, TEREX'S BOARD OF DIRECTORS, RONALD DEFEO, G. CHRIS ANDERSEN, PAULA CHOLMONDELEY, DONALD DEFOSSET, WILLIAM H. FIKE, THOMAS J. HANSEN, DONALD P. JACOBS, DAVID A. SACHS, OREN G. SHAFFER, DAVID C. WANG, and HELGE H. WEHMEIER,<br><br>        Defendants. | MASTER FILE NO. 3:10-cv-00006-RNC<br><br>Jury Trial Demanded |

## CONSOLIDATED AMENDED COMPLAINT

Plaintiffs Kenneth M. Lipman, Eddie Webb, Binyam Ghebreghiorgis, Scott Hollander and

Mark Caswell ("Plaintiffs"), on behalf of themselves and the Terex Corporation and Affiliates'

401(k) Retirement Savings Plan (the "Plan"), and/or alternatively, on behalf of a class consisting of similarly situated participants and beneficiaries (the "Participants") of the Plan, by their attorneys, allege the following for their Consolidated Amended Complaint (the "Complaint"). The allegations contained herein are based on the investigation of counsel, except for those allegations pertaining to Plaintiffs, which are based upon personal knowledge. Plaintiffs may, after discovery and/or disclosure proceedings in this case, seek leave to further amend the Complaint to add new parties or claims.

## NATURE OF ACTION

1.     Plaintiffs, who were Participants in the Plan during time periods relevant to the Complaint, bring this civil enforcement action under Section 502(a) of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132(a), for Plan-wide relief based upon the Plan's purchases and holdings of shares of common stock of Terex Corporation ("Terex" or the "Company") or units of the Terex Stock Fund (the "Fund") at any time from December 31, 2007 to February 27, 2009, inclusive (the "Relevant Period").[1] Plaintiffs bring this action on behalf of the Plan pursuant to § 502(a)(2) of ERISA, 29 U.S.C. § 1132(a)(2). As more fully set forth below, Defendants breached their fiduciary duties to Participants, including those fiduciary duties set forth in ERISA Section 404, 29 U.S.C. § 1104, and Department of Labor Regulations, including 29 C.F.R. § 2550. Plaintiffs thus bring this action as Participants seeking Plan-wide relief for breaches of fiduciary duty on behalf of the Plan. Plaintiffs also bring a claim on behalf of the Plan to recover delinquent contributions owed to the Plan and the Participants by Terex.

---

[1] Plaintiffs reserve their right to seek modification of the Relevant Period definition if discovery reveals a more appropriate time period. *See, e.g., Lively v. Dynegy*, No. 05-CV-00063, 2007 WL 685861, at *6 (S.D. Ill. Mar. 2, 2007) ("the proper termination date of the proposed class period is the date when Dynegy stock ceased to be, as Plaintiffs allege, an imprudent investment for the Plan").

2.     In the alternative, Plaintiffs bring this action as a class action pursuant to Fed. R. Civ. P. 23(a) and Fed. R. Civ. P. 23(b)(1) and/or (b)(3) of the Federal Rules of Civil Procedure, on behalf of the following class of persons similarly situated (the "Class"):

> All current and former Participants in the Plan for whose individual accounts the Plan held shares of Terex stock or units of the Fund at any time from December 31, 2007 to February 27, 2009.

3.     Plaintiffs allege in Count I that Defendants, each having certain responsibilities regarding the management and investment of Plan assets, breached their fiduciary duties by: (i) failing to prudently and loyally manage the Plan's investment in Company stock; (ii) investing Plan assets in Company stock when it was imprudent to do so; (iii) failing to provide complete and accurate information to Plan participants regarding the Company's financial condition and the prudence of investing in Company stock; and (iv) maintaining the Plan's pre-existing significant investment in Company securities when they were no longer prudent investments for the Plan. These actions/inactions run directly counter (a) to the express purpose of ERISA pension plans, which are designed to help provide funds for participants' retirement (*see* ERISA § 2, 29 U.S.C. § 1001 ("CONGRESSIONAL FINDINGS AND DECLARATION OF POLICY")) and (b) upon information and belief, the purpose of the Plan (*i.e.*, to save for retirement).

4.     Plaintiffs allege in Count II that certain Defendants failed to avoid or ameliorate inherent conflicts of interests which crippled their ability to function as independent, "single-minded" fiduciaries with only the Plan's and the Participants' best interests in mind.

5.     Plaintiffs allege in Count III that certain Defendants breached their fiduciary duties by failing to adequately monitor other persons to whom management/administration of Plan assets was delegated, despite the fact that such Defendants knew or should have known that such other fiduciaries were imprudently allowing the Plan to continue offering Terex stock as an investment option and investing Plan assets in Terex stock when it was not prudent to do so.

6.     Plaintiffs allege in Count IV that Defendants breached their co-fiduciary duties.

7.     Count V is brought to recover delinquent contributions owed to the Plan and the Participants by Terex.

8.     Plaintiffs allege that Defendants allowed the significant imprudent investment of the Plan's assets in Terex stock throughout the Relevant Period.  Defendants knew or should have known that such investment was imprudent because during the Relevant Period:

(a)     the Company was experiencing significant undisclosed problems, including diminished customer demand for the Company's roadbuilding and construction products, cancellations of orders and delays in acceptances of deliveries by customers due, in large part, to adverse conditions in relevant housing and construction markets, to the subprime mortgage crisis and tightening of credit in the United States and other Company markets, and related softness in residential and commercial construction projects;

(b)     due to adverse conditions in the housing and construction industries, Terex's order backlog was largely illusory and order cancellations and deferrals of deliveries would follow, leading to both disappointing financial results by the Company and an enormous write-down of assets and related losses;

(c)     the Company improperly accounted for impaired assets in its "Roadbuilding, Utility Products and Other" ("RBUO") and "Construction" segments;

(d)     the Company's Construction and RBUO segment-related assets were impaired and were carried on the books and records of Terex, and reported in Terex's published financial statements, at values far in excess of the correct or fair carrying value of those assets;

(e)     the Company's inflated asset values required a substantial write-down of RBUO and Construction assets, and

(f)     the aforesaid significant undisclosed problems that were being experienced by the Company, *inter alia*, caused the Company's stock price to suffer as the truth became known.

9.     During the Relevant Period, the significant investment of Plan's Participants' retirement savings in Company stock resulted in significant losses to the Plan and Participants. Nevertheless, Defendants continued to allow the Plan to offer the Fund as an investment option and to allow the Fund to hold and purchase Terex stock in individual Participant accounts. Despite the discretion they were given by both the Plan and by ERISA, the Defendants/fiduciaries did nothing to protect the Plan and the Participants as the Company's problems snowballed and the Company's stock price plummeted, as shown by this chart:



10.     Terex's stock price has not recovered as of the filing of this Complaint, and is still down about 40% since the start of the Relevant Period.



11.     Especially given that the Fund was the largest Plan investment at year-end 2007 (28.3%), 2008 (22.4%), and 2009 (19.1%),[2] prudent investment management demanded, *inter alia*, that Defendants not merely follow the price of Terex stock to determine whether the Fund was appropriate for the Plan.   ERISA required Defendants to scrutinize the risk of continued Plan investment in Terex stock—based upon, *inter alia*, the public information upon which the stock price was based—to protect the Plan's Participants' retirement savings. Regardless of its price, during the Class Period, Terex stock was an imprudent investment for the Plan Participants, even if it was a proper investment for some outside investors, because ERISA requires fiduciaries to avoid taking excessive risk with retirement assets.   Plan Participants had a very different perspective in their investment in Company stock than public investors, in that for retirement, they

---

[2] The decrease in percentage is largely a function of the diminution in value of Terex stock lowering the Plan's assets from almost $326 million at year-end 2007 to just over $262 million at year-end 2009.   As described below, the Plan *acquired* a large amount of Terex shares as the percentage of Plan assets represented thereby dropped.   It is thus not a function of retirement savings being invested elsewhere, but a function of retirement savings ceasing to exist.

sought a less risky, more prudent investment. And to assure a prudent retirement investment, the Plan Participants had every right under ERISA to expect the Plan fiduciaries to act in their interest and protect them from unduly risky investments, whether in Company stock or any other asset. Had Defendants conducted a prudent evaluation of whether Terex stock was an appropriate investment for the Plans during the Class Period, and taken protective action, such as ceasing its purchase, divesting the Plans of such stock, or other actions as described below, Plan Participants would not have suffered such devastating losses to their retirement savings.

12. Moreover, some, if not all, Defendants, given the facts described herein and based on their positions within Terex, were aware of material inside information indicating that Terex's situation was worse than was publicly known, and they had a concomitant ERISA duty to disclose that information, cause the Plans to cease purchasing Terex securities, and/or take other steps as necessary and appropriate to avoid the massive Plan losses that eventually ensued.

13. This action is brought on behalf of the Plan and seeks losses to the Plan for which Defendants are liable pursuant to ERISA §§ 409 and 502, 29 U.S.C. §§ 1109 and 1132, which specifically authorize participants, such as Plaintiffs, to sue for relief to the Plan for breaches of fiduciary duty such as those alleged herein. ERISA §§ 409(a) and 502(a)(2), 29 U.S.C. §§ 1109 and 1132(a)(2), authorize participants, such as Plaintiffs, to sue in a representative capacity for losses suffered by the Plan as a result of breaches of fiduciary duty and/or pursuant to Fed. R. Civ. P. 23.

## JURISDICTION AND VENUE

14. Plaintiffs' claims arise under and pursuant to ERISA Section 502, 29 U.S.C. § 1132.

15. This Court has jurisdiction over this action pursuant to ERISA Section 502(e)(1), 29 U.S.C. § 1132(e)(1).

16.     Venue is proper in this District pursuant to ERISA Section 502(e)(2), 29 U.S.C. § 1132(e)(2), because the Plan was administered in this District, breaches of fiduciary duty took place in this District, and one or more Defendants reside or may be found in this District.

## THE PARTIES

**Plaintiffs**

17.     Plaintiff Kenneth M. Lipman ("Lipman") is a resident of the State of Mississippi. Plaintiff Lipman was employed by Terex (or a subsidiary or division of Terex) for several years until approximately January 2009, and maintained an investment in Terex stock through the Fund in the Plan during the Relevant Period.

18.     Plaintiff Eddie Webb ("Webb") is a resident of the State of Washington. Plaintiff Webb is a "participant" in the Plan, within the meaning of ERISA § 3(7), 29 U.S.C. § 1102(7), and held Terex stock through the Fund in the Plan during the Relevant Period.

19.     Plaintiff Binyam Ghebreghiorgis ("Ghebreghiorgis") is a resident of the State of Washington. Plaintiff Ghebreghiorgis is a "participant" in the Plan, within the meaning of ERISA § 3(7), 29 U.S.C. § 1102(7), and held Terex stock through the Fund in the Plan during the Relevant Period.

20.     Plaintiff Scott Hollander ("Hollander") is a resident of the State of Iowa. Plaintiff Hollander is a "participant" in the Plan, within the meaning of ERISA § 3(7), 29 U.S.C. § 1102(7), and held Terex stock through the Fund in the Plan during the Relevant Period.

21.     Plaintiff Mark Caswell ("Caswell") is a resident of the state of Iowa. Plaintiff Caswell is a "participant" in the Plan, within the meaning of ERISA § 3(7), 29 U.S.C. § 1102(7), and held Terex stock through the Fund in the Plan during the Relevant Period.

**The Company**

22.     Defendant Terex has represented itself to be a diversified global manufacturer of capital equipment focused on delivering reliable, customer-relevant solutions for the construction, infrastructure, quarrying, surface mining, shipping, transportation, refining and utility industries. The Company operates in five segments: (1) RBUO; (2) Terex Aerial Work Platforms; (3) Terex Construction; (4) Terex Cranes; and (5) Terex Materials Processing & Mining.  The Company is incorporated in Delaware and maintains its principal place of business at 200 Nyala Farm Road, Westport, CT 06880.

23.     The Company's RBUO segment designs, manufactures, and markets asphalt and concrete equipment (including pavers, transfer devices, plants, mixers, reclaimers, stabilizers, placers and cold planers), landfill compactors, and utility equipment (including digger derricks, aerial devices and cable placers), as well as related components and replacement parts.  The Company's Construction segment designs, manufactures, and markets two primary categories of construction equipment and their related components and replacement parts: heavy construction equipment (including off-highway trucks, motor scrapers, motor graders, hydraulic excavators, large wheel loaders, material loading machines and truck mounted articulated hydraulic cranes) and compact construction equipment (including loader backhoes, compaction equipment, mini and midi excavators, site dumpers and wheel loaders).   Construction, forestry, rental, mining, industrial, and government customers use these products in construction and infrastructure projects and in coal, minerals, sand and gravel operations.

24.     Terex was the Plan's sponsor and was a fiduciary of the Plan at all times relevant to the Relevant Period.  Terex breached its fiduciary and co-fiduciary duties as described below.

25.     Terex, acting through its Board of Directors, appointed the persons who managed and administered the Plan on a day-to-day basis.  Terex is legally responsible for the malfeasance of its Board of Directors and appointed persons alleged herein.

26.     Instead of delegating fiduciary duties for the Plan to outside service providers, Terex internalized the Plan's fiduciary functions and appointed its officers and senior executives as Plan fiduciaries.

**The Committee Defendants**

27.     At all times relevant to this Complaint, Defendant Administrative Committee of the Terex Corporation and Affiliates' 401(k) Retirement Savings Plan (the "Committee") managed and administered the Plan and the assets of the Plan and acted as a fiduciary with respect to the Plan.  The Plan's Form 11-K Annual Report for the fiscal year ended December 31, 2008, which was filed with the SEC on June 25, 2009 (the "2008 11-K")[3] states that "[a]n Administrative Committee, consisting of at least three members appointed by the Company's Board of Directors, administers the benefit structure of the Plan.  The Administrative Committee is considered the Plan Administrator for purposes of ERISA."  Similarly, the Terex Corporation and Affiliates' 401(k) Retirement Savings Plan, Amended and Restated Effective January 1, 2002 (the "Plan Document") sets forth in Section 3.01 titled "Administrative Committee" that

> The Plan shall be administered by the Administrative Committee, which shall consist of at least three (3) persons from time to time appointed by the Board and serving at the pleasure of the Board. Any vacancies on the Administrative Committee, whether caused by death, resignation, removal or other reason, shall be promptly filled by the Board, but shall not affect the Administrative Committee's authority to act hereunder pending such Board action.

---

[3] www.sec.gov/Archives/edgar/data/97216/000009721609000146/f11k062509.htm

28. During the Relevant Period, the Committee consisted of senior executives of the Company, including its Chief Financial Officer ("CFO"), its general counsel, and its Vice President of Finance, Treasury and Risk Management. Members of the Committee knew or should have known of the problems identified below, which rendered the Company's stock an imprudent retirement investment.

29. At times relevant to this Complaint, Defendant Phillip C. Widman ("Widman"), Senior Vice President and CFO of the Company, was a member of the Committee. Defendant Widman signed the 2008 11-K on behalf of the Plan's trustee. Defendant Widman has been Terex's Senior Vice President and CFO since 2002. Defendant Widman also signed the Plan's Form 5500 Annual Return/Report of Employee Benefit Plan for fiscal year 2007 (the "2007 5500") on July 29, 2008, on behalf of both the Plan Administrator (the "Committee") and the Plan Sponsor (the "Company"). Defendant Widman was a fiduciary of the Plan during the Relevant Period.

30. At times relevant to this Complaint, Defendant Charles Snavely ("Snavely"), Vice President of Finance, Treasury and Risk Management of the Company, was a member of the Committee. Defendant Snavely was a fiduciary of the Plan during the Relevant Period.

31. At times relevant to this Complaint, Defendant Kevin A. Barr ("Barr"), Vice President, Human Resources of the Company, was a member of the Committee. Defendant Barr was a fiduciary of the Plan during the Relevant Period.

32. At times relevant to this Complaint, Defendant Eric I. Cohen ("Cohen"), Senior Vice President, Secretary and General Counsel of the Company, was a member of the Committee. Defendant Cohen was a fiduciary of the Plan during the Relevant Period.

33.     At times relevant to this Complaint, Defendant Tricia E. Pole ("Tricia E. Pole"), Employee Benefits Manager of the Company, was a member of the Committee. Defendant Pole was a fiduciary of the Plan during the Relevant Period.

34.     At times relevant to this Complaint, Defendant Robert K. Brown ("Brown"), Vice President of Compensation and Benefits of the Company, was a member of the Committee. Defendant Brown was a fiduciary of the Plan during the Relevant Period.

35.     The Committee and Defendants Widman, Snavely, Barr, Cohen, Pole, and Brown are referred to herein collectively as the "Committee Defendants."

**The Monitoring Defendants**

36.     According to the 2008 11-K and Section 3.1 of the Plan Document (quoted *supra* at ¶ 27), the Committee is appointed by the Company's Board of Directors (the "Board"). Because the Board and its members were responsible for appointing the Committee Defendants, who administered the Plan, the Board and its members were also Plan fiduciaries and are named as defendants herein.

37.     Defendant Ronald DeFeo ("DeFeo") served as a member of the Board and has been Chairman of the Board and Chief Executive Officer of the Company since 2007.

38.     Defendant G. Chris Andersen ("Andersen") served as a member of the Board and as Lead Director during the Relevant Period. As Lead Director, Defendant Andersen was elected from among the Board's independent directors to serve as their leader at companies where the CEO is the board chair.

39.     Defendant Paula Cholmondeley ("Cholmondeley") served as a member of the Board during the Relevant Period.

40.     Defendant Donald DeFosset ("DeFosset") served as a member of the Board during the Relevant Period.  Further, Defendant DeFosset served as a member of the Compensation Committee during the Relevant Period.

41.     Defendant William H. Fike ("Fike") served as a member of the Board during the Relevant Period.  Further, Defendant Fike served as a member of the Compensation Committee during the Relevant Period.

42.     Defendant Thomas J. Hansen ("Hansen ") served as a member of the Board during the Relevant Period.

43.     Defendant Donald P. Jacobs ("Jacobs") served as a member of the Board during the Relevant Period.

44.     Defendant David A. Sachs ("Sachs") served as a member of the Board during the Relevant Period. Further, Defendant Sachs served as Chairperson of the Compensation Committee during the Relevant Period.

45.     Defendant Oren G. Shaffer ("Shaffer") served as a member of the Board during the Relevant Period. Further, Defendant Shaffer served as a member of the Compensation Committee during the Relevant Period.

46.     Defendant David C. Wang ("Wang") served as a member of the Board during the Relevant Period. Further, Defendant Wang served as a member of the Compensation Committee during the Relevant Period.

47.     Defendant Helge H. Wehmeier ("Wehmeier ") served as a member of the Board during the Relevant Period.

48. The Board and Defendants DeFeo, Andersen, Cholmondeley, DeFosset, Fike, Hansen, Jacobs, Sachs, Shaffer, Wang, and Wehmeier are referred to herein collectively as the "Monitoring Defendants."

49. The Monitoring Defendants were responsible for appointing and monitoring the Committee Defendants. The Monitoring Defendants failed to properly appoint, monitor and inform such persons in that the Monitoring Defendants failed to adequately inform the Committee Defendants of the true financial and operating condition of the Company or, alternatively, the Monitoring Defendants did adequately inform the Committee Defendants of the true financial and operating condition of the Company (including the financial and operating problems being experienced by Terex during the Relevant Period identified herein) but nonetheless continued to allow such persons to offer Terex stock as an investment option under the Plan when Terex stock was not a prudent investment for Participants' retirement accounts under the Plan, thus breaching their duty to monitor the Committee Defendants. Liability is only asserted against each of the Monitoring Defendants for such periods of time as each Monitoring Defendant acted as a fiduciary with respect to the Plan. The Monitoring Defendants were directors and/or officers of the Company and knew or should have known of the Company's problems as described herein.

## ALTERNATIVE CLASS ACTION ALLEGATIONS

50. As noted above, Plaintiffs bring this action derivatively pursuant to § 502(a)(2) and (3) of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132(a)(2) and (3). Alternatively, Plaintiffs bring this action as a class action pursuant to Fed. R. Civ. P. Rules 23(a), (b)(1)(B) and/or (b)(3) of the Federal Rules of Civil Procedure, on behalf of the Class defined in paragraph 2.

51.     The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are, at minimum, thousands of members of the Class.  The Plan's 2007 Form 5500 lists 6,123 Plan Participants as of December 31, 2007.

52.     Common questions of law and fact exist as to all members of the Class, which predominate over any questions affecting solely individual members of the Class.  Among the questions of law and fact common to all members of the Class are:

(a)     Whether Defendants were Plan fiduciaries;

(b)     Whether Defendants breached their fiduciary duties to the Plan, Plaintiffs and/or the members of the Class;

(c)     Whether the Plan and the Participants were injured by such breaches; and

(d)     Whether the Plan and the Participants are entitled to damages and injunctive relief.

53.     Plaintiffs' claims are typical of the claims of the other members of the Class, as Plaintiffs and all members of the Class sustained injury arising out of Defendants' wrongful conduct in breaching their fiduciary duties and violating ERISA as complained of herein.

54.     Plaintiffs will fairly and adequately represent and protect the interests of the Class. Plaintiffs have retained able counsel with extensive experience in class action ERISA litigation. The interests of Plaintiffs are coincident with and not antagonistic to the interests of the other members of the Class.

55.     Prosecution of separate actions by members of the Class would create a risk of inconsistent adjudications with respect to individual members of the Class which would establish

incompatible standards of conduct for Defendants, or adjudications with respect to individual members of the Class would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

## DESCRIPTION OF THE PLAN

56. At all times relevant to this Complaint, the Plan was an employee benefit plan within the meaning of ERISA §§ 3(3) and 3(2)(A), 29 U.S.C. §§ 1002(3) and 1002(2)(A).

57. At all times relevant to this Complaint, the Plan was a "defined contribution" or "individual account" plans within the meaning of ERISA Section 3(34), 29 U.S.C. § 1002(34), in that the Plan provided for individual accounts for each Participant and for benefits based solely upon the amount contributed to the Participant's account, and for any income, expenses, gains and losses, and any forfeitures of accounts of other Participants that could be allocated to such Participant's accounts.

58. At all times relevant to this Complaint, the Plan provided a number of different options for investment of the Plan's assets, including the Fund.

59. At all times relevant to this Complaint, Participants were allowed to direct the Plan to purchase investments from among the investment options available under the Plan and allocate them to their individual accounts. The investment options made available to Participants were selected solely by, and at the discretion of, the Plan's fiduciaries. Participants who enrolled in the Plan but did not register investment elections with the Plan's trustee had their contributions directed to the Fund, pursuant to the Plan's administrator.

60. No Plan investment option was compelled, or even suggested, by the governing plan documents. A Form S-8 filed by the Company on February 14, 1996 includes certain

provisions of the Plan, including Section 6.05, which stated that "[t]he Administrative Committee *shall have the authority* to offer an Investment Fund *which may* invest up to one hundred percent (100%) of the fair market value of its assets in 'qualifying employer securities' as that term is defined in ERISA."  (Emphasis added).

61.     The governing Plan Document also gave the Plan's fiduciaries unfettered discretion during the Relevant Period in deciding whether or not to allow Company stock to be among the Plan's Investment Funds.  Article 2 of the Plan Document defines "Investment Fund" as "any of the funds referred to in Section 6.05 hereof which are established for the investment of a Participant's Account balances and constitute part of the Trust Fund."  Article 6.05 of the Plan Document, entitled "Investment Funds", sets forth that:

> There shall be maintained within the Trust Fund a broad range of Investment Funds available for the investment of a Participant's Account with whatever characteristics may be specified by the Administrative Committee; provided; however, that at least three (3) of the available Investment Funds shall satisfy the requirements of ERISA Section 404(c) and the U.S. Department of Labor Regulations promulgated pursuant thereto.  The ***Administrative Committee shall have the authority to change the characteristics of any Investment Fund and/or to eliminate or add any Investment Fund as it may, in its sole discretion, deem appropriate from time to time.***  The continued availability of any Investment Fund is necessarily conditioned upon the terms and conditions established by the Administrative Committee and as provided in the applicable Investment Manager agreement, if any, and cannot be assured to remain in existence or have the same terms and conditions apply from time to time.  The Administrative Committee shall also be authorized to select and remove the Trustee or any Investment Manager, as the case may be, with responsibility for managing the investment and reinvestment of any Investment Fund.  Any action of the Administrative Committee under this Section 6.05 shall be communicated by it to all Participants at the earliest practicable time so they may determine the impact of such action on their existing investment directions.

> The Administrative Committee ***shall have the authority*** to offer an Investment Fund which ***may invest up to 100% of the fair market***

*value of its assets in 'Qualifying employer securities' as that term is defined in ERISA.*

(Emphasis added).

62. The Committee's unfettered discretion to choose Plan investment options is further demonstrated by Section 3.02 of the Plan Document, entitled "Responsibility and Authority of the Administrative Committee[,]" which sets forth that "[s]ubject to the requirements of ERISA and unless specifically provided otherwise under the provisions of the Plan [Document] and the [the Master Trust agreement between Terex and Fidelity Management Trust Company, dated February 1, 2000, and all Amendments thereto (the "Trust")], the Administrative Committee shall have full and complete authority, responsibility and control over the management, administration, and operation of the Plan[.]"

63. Nothing in the Plan Document, or in any of the documents that governed the management and administration of the Plan, so much as suggested that the Committee should offer Terex stock as a Plan investment option much less required its offering. Moreover, to the extent that the Committee chose to allow the Fund as a Plan investment, the Committee had to monitor the prudence of both acquiring and holding the Fund. As the Master Trust Agreement Between Terex Corporation and Fidelity Management Trust Company for the Plan dated as of February 1, 2000 (the "Master Trust") sets forth in Section 5.e.2, "[t]he Named Fiduciary shall continually monitor the suitability under the fiduciary duty rules of section 404(a)(1) of ERISA (as modified by section 404(a)(2) of ERISA) of acquiring and holding Sponsor Stock . . . ."

64. Plan Section 5.02 states that "Matching Contributions . . . may be made in cash or in 'qualifying employer securities' as that term is defined in section 406(a)(1)(E) of ERISA." The decision whether to contribute cash or stock was an exercise of "any authority or control respecting management or disposition of its assets" so it was a fiduciary decision under ERISA. 29 U.S.C. §

18

1102(21)(A)(i). Terex made the decision to make the matching contributions in highly risky, artificially inflated Terex stock. This was breach of fiduciary duty by Terex.

65. The 2008 11-K states, among other things:

**1.      Description of Plan**

The following description of the Terex Corporation and Affiliates' 401(k) Retirement Savings Plan (the "Plan") provides only general information. Participants should refer to the Plan document for a more complete description of the Plan's provisions.

General – The Plan is a defined-contribution plan that covers certain salaried and hourly employees of Terex Corporation (the "Company") and its subsidiaries meeting minimum eligibility requirements. The investments of the Plan are held in a trust account by Fidelity Management Trust Company ("Fidelity"), the trustee of the Plan.

The Plan is subject to the provisions of the Employee Retirement Income Security Act of 1974 ("ERISA").

An Administrative Committee, consisting of at least three members appointed by the Company's Board of Directors, administers the benefit structure of the Plan. The Administrative Committee is considered the Plan Administrator for purposes of ERISA.

* * *

Participant Eligibility – Permanent employees, that are not represented under a collective bargaining agreement, may begin participation on the first day of the month following their hiring.

* * *

Contributions – Participants may contribute a maximum of 80% of their compensation to the Plan in any combination of pre-tax, Roth or post-tax contributions. The Company provides safe harbor matching contributions of 100% of the first 4% of the participant's contributions, except for Represented employees of Reedrill, Halco and Simplicity.

* * *

Company contributions are made in Terex Corporation common stock, $.01 par value per share ("Common Stock"). Company matching contributions in Common Stock are unrestricted, thereby

19

allowing participants to exchange the value of Common Stock into other investment options.

66.     The 2008 11-K represents that as of December 31, 2007, the Plan held net assets of $323,173,387, of which $91,561,654, or over 28%, were invested in Company stock.  As of December 31, 2008, the Plan held net assets of $205,870,162, of which $32,249,487, or 15.6%, were invested in Company stock.  The 2008 11-K also represents that there was a net depreciation of $68,900,010 in the Company stock held by the Plan during 2008.

67.     During the Relevant Period, the market price of Terex common stock was overvalued due to the concealment and/or materially incomplete and inaccurate statements of Terex's true financial and operating condition as described herein.  Further, throughout the Relevant Period, Terex common stock was not a prudent investment for the Participants' individual retirement accounts under the Plan.

## ADMINISTRATION OF THE PLAN

68.     Defendants, as fiduciaries of the Plan, were required by ERISA to furnish certain information to Participants.  For example, ERISA Section 101, 29 U.S.C. § 1021, requires a plan's administrator to furnish a Summary Plan Description ("SPD") to the plan's participants.  ERISA Section 102, 29 U.S.C. § 1022, provides that an SPD must apprise participants of their rights and obligations under the plan.  In addition, every person who held Terex stock in a Plan account annually received a Proxy Statement which purported to describe (including through the incorporation of other company documents) the business and operations of Terex.

69.     At all times relevant to this Complaint, Defendants had the discretion to establish and change the investment alternatives among which Participants could direct the investment of the Plan's assets allocated to their accounts.

70.     At all times relevant to this Complaint, Defendants had a duty to review the Plan's investment policies, as well as the selection and the performance of investment alternatives offered under the Plan. There was no requirement that any assets of the Plan be invested in Company stock or that Company stock be continued as an investment alternative.

71.     At all times relevant to this Complaint, Defendants other than Terex had a duty to obtain from the Company information necessary for the proper administration of the Plan.

72.     At all times relevant to this Complaint, Defendants were fiduciaries of the Plan as defined by ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because they exercised discretionary authority or control respecting management of the Plan or exercised discretionary authority or control respecting management or disposition of assets and had discretionary authority or responsibility in the administration of the Plan.

73.     Each Defendant is liable for the breaches of fiduciary duty of the other Defendants under ERISA Section 405, 29 U.S.C. § 1105.

**TEREX STOCK WAS AN IMPRUDENT INVESTMENT FOR THE PLAN**

74.     Shortly before the start of the Relevant Period, Terex stock "fell amid news of the subprime mortgage crisis. Some analysts have cited concerns that a commercial construction slowdown or possible recession would follow the U.S. residential housing slump, and hurt sales of Terex machinery." "Still Making Earth Move; Despite Stock Slide, Heavy Equipment Maker Bearing Up Against Economy's Weight" *Hartford Courant*, December 6, 2007.

75.     Terex stock was not a prudent investment option for the Plan because, throughout the Relevant Period, macroeconomic conditions and a slowdown in the housing and construction industries made the Company's order backlog for its roadbuilding and construction products largely illusory and led, predictably, to significant customer order cancellations and deferrals of

deliveries. As a result of adverse industry conditions, the Company experienced order cancellations and deferrals of deliveries, which led to disappointing financial and operating results and the enormous write-down of assets announced in February of 2009. Further, throughout the Relevant Period. the Company's RBUO and Construction assets were impaired and carried on the books and records of Terex and reported in Terex's published financial statements at values far in excess of the correct or fair carrying value of those assets.

76.     That Terex's Construction-related assets were impaired and valued far in excess of the correct values throughout the Relevant Period is evidenced by the enormous charge against earnings recorded by the Company in February of 2009 as a consequence of what the Company described as "our annual goodwill impairment test." That test resulted in an "impairment charge for goodwill of $459.9 million and represented all of the goodwill recorded in the Construction and RBUO segments."

77.     Questions about whether the Company was correctly reporting the value of the RBUO and Construction segment-related assets, and the enormous charge against earnings reported in February of 2009 as alleged above, predictably and foreseeably lowered the Company's stock price and resulted in huge losses to the Plan and to the Participants' retirement savings.

78.     The fiduciaries of the Plan, especially Defendant Widman, Terex's CFO, knew or should have known that the Company's order backlog for roadbuilding and construction products was largely illusory, and that order cancellations and deferrals of deliveries would follow from the industry slowdown in the housing and construction industries. Indeed, Terex and its senior executives cannot seriously claim to have been surprised by order cancellations and deferrals of deliveries in the roadbuilding and construction units given Terex's admitted close and continuing

communication with its customers[4] and its admitted understanding of the link between a slowdown

in the construction industry and reduced customer demand for its products.[5]  The fiduciaries of the

Plan, especially Defendant Widman, Terex's CFO, knew or should have known that the reported

value of the Construction segment-related assets were overstated and/or impaired, or at least that

both factors specific to the Company and macro-economic conditions, including the subprime

mortgage crisis and tightened credit which diminished demand for new construction projects and

thus for the Company's products, raised serious questions about the reliability of the Company's

asset valuation procedures and results.

**The Applicable Accounting Rules for Reporting The Impairment of Assets**

79.     During the Relevant Period, the Company indicated publicly at various times that

it was considering the possibility of reducing the estimated fair value of certain of its assets due to

possible impairment of asset issues.  The Company, however, did not reduce the estimated fair

value of assets in its RBUO or Construction lines of business until February of 2009.  For the

reasons alleged herein, including significantly reduced customer demand for products in those

lines of business resulting, in large part, from adverse conditions in the housing and construction

industries, and the subprime mortgage crisis and tightening of credit in the United States and other

markets, the Company should have reduced the reported value of assets in these lines of business

much earlier than February 2009.  Had Defendants made timely and accurate disclosure of the

---

[4] See Textron Form 10-K Annual Report dated as of February 26, 2009 at 14 of 175 ("Terex is committed to being customer-centric . . .  This requires and intense understanding of what our customers need . . . It involves listening to the customer's need and wants [and] understanding them . . ."

[5] See Textron Form 10-K Annual Report dated as of February 26, 2009 at 23 of 175 (describing reduced Construction segment backlog at year-end 2008 compared to year-end 2007, and admitting that "[b]acklog at December 31, 2008 was lower primarily due to a significant reduction in construction activity in most end markets for the segment's products."

problems Terex was experiencing and the foreseeable consequences of those problems, the market price of Company stock would not have declined as substantially as it did when, instead of making timely and accurate disclosure, the Company downplayed its problems and postponed a required asset write-down until February 2009, as alleged herein.

80.     The Company failed to follow the rules governing the impairment of assets, which are set out in Statement of Financial Accounting Standards No. 5.   Statement of Financial Accounting Standards No. 5 – Accounting for Contingencies ("SFAS 5") provides guidance on the accounting and reporting for loss contingencies.   The first paragraph defines a contingency as ". . . an existing condition, situation, or set of circumstances involving uncertainty as to possible . . . loss (hereinafter, a "loss contingency") to an enterprise that will ultimately be resolved when one or more future events occur or fail to occur."

81.     Pursuant to SFAS 5, ¶ 8, an entity is required to accrue for a loss contingency, with a concomitant charge to the income account, when both of the following elements are met:

      a.      Information available prior to issuance of the financial statements indicates that it is *probable that an asset has been impaired* or a liability incurred at the date of the financial statements.  It is implicit in this condition that it must be probable that one or more future events will occur confirming the fact of the loss.

      b.      The *amount of loss can be reasonably estimated.*

(Emphasis added).

82.     A contingent loss is required to be accrued under SFAS 5 when the loss is both "probable" and "reasonably estimable."   SFAS 5 indicates that the term probable is defined as: "The future event or events are likely to occur."   SFAS 5, ¶ 3(a).   The pronouncement goes on to state that, in order for the financial statements not to be misleading, disclosure of the nature and/or the amount of an accrual may be necessary.   SFAS 5, ¶ 9.   Based upon this information, losses should be reserved for when they are both "probable" and "reasonably estimable."

83.    In addition, because of the significance of contingencies to reasonable investors, the Financial Accounting Standards Board ("FASB") requires, under certain conditions, the disclosure of loss contingencies even when both of the above conditions (*i.e.*, "probable" and "estimable") have not been met.  SFAS 5, ¶ 10 clearly states:

> If no accrual is made for a loss contingency because one or both of the conditions in paragraph 8 are not met, or if an exposure to loss exists in excess of the amount accrued pursuant to the provisions of paragraph 8, disclosure of the contingency shall be made when there is at least a reasonable possibility that a loss or an additional loss may have been incurred. The disclosure shall indicate the nature of the contingency and shall give an estimate of the possible loss or range of loss or state that such an estimate cannot be made[.]

84.    Under these rules disclosure of a contingency must be made when it is "reasonably possible" (versus, *e.g.*, "probable") that a loss may have been incurred, even if the amount of the loss cannot be reasonably estimated (SFAS 5, ¶ 8).  SFAS 5 defines "reasonably possible" as: "The chance that the future event or events will occur *more than remote but less than likely*."  (SFAS 5, ¶ 3(b) (Emphasis added)).  Thus, even when a loss is "less than likely," or when the loss cannot be estimated, disclosure of a loss contingency is still required by GAAP.  In fact, SFAS 5 goes on to state: "If a disclosure is deemed necessary, the financial statements shall indicate the nature of the loss or loss contingency and give an estimate of the amount or range of loss or possible loss or state that such an estimate cannot be made."

85.    During the Relevant Period the Company's problems in its roadbuilding and construction units were known by or should have been known by the Plan's fiduciaries and were at least "reasonably possible," if not "probable," within the meaning of SFAS 5.

**Terex's Common Stock was an Imprudent Plan Investment Because the Company was Severely Impacted By Deteriorating Demand for its Products and Failed to Timely and Adequately Account for Impaired Assets**

86.     On January 2, 2008, the first trading day of the Relevant Period, Terex stock opened at $66.24 per share on the New York Stock Exchange ("NYSE").

87.     On February 20, 2008, the Company issued a Form 8-K, which included as an exhibit a press release announcing Terex's results of operations and related financial information for the fourth quarter of 2007 and providing guidance for 2009.  This Form 8-K was a fiduciary communication as it was incorporated into Plan documents.  The February 20, 2008 Form 8-K announced net income for the fourth quarter of 2007 of $174.0 million, or $1.67 per share, compared to net income of $100.9 million, or $0.97 per share, for the fourth quarter of 2006, and further stated:

> "For Terex, 2007 was a very strong year in terms of financial performance, with our best sales quarter of the year coming in the fourth quarter.  This was a transformational year for our Company, as it demonstrated that the changes made as part of the journey we embarked on a few years back are taking hold and working," commented Ron DeFeo, Terex Chairman and Chief Executive Officer.  We have benefited from strong global markets, as well as a relatively small exposure to the U.S. housing market; in fact non-U.S. net sales represented 70% of our total net sales for the full year 2007."
>
> Mr. DeFeo added, "*We continue to build a better and stronger operating company* while keeping honed the skills of a targeted acquirer of assets.  The supply chain and component shortages we are facing continue, but we are making steady progress.

(Emphasis added).

88.     The Company's February 20, 2008 Form 8-K also noted that the Company's backlog had increased 53% from the fourth quarter of 2006, and stood at $4.18 billion.  The backlog, which later proved to be illusory, was described in the February 20, 2008 Form 8-K as being "mainly driven by the continued sharp increase in crane orders, which are outpacing the

Company's ability to manufacture and deliver products to its customers." The Company further represented therein that the "Construction backlog more than doubled over the prior year." Further, "[w]ith regards to Terex Roadbuilding, Utility Products and Other (RBUO) backlog, RBUO backlog at December 31, 2006 included Terex Government Programs of $38.4 million."

89.     The February 20, 2008 Form 8-K quoted Defendant DeFeo as stating that "we are poised to have another record financial performance in 2008 . . . .  We expect generally strong global markets to continue to drive demand for our equipment."

90.     Following the February 20, 2008 announcement, the Company's stock price rose 7.26%, or $4.52 per share, to close at $66.73 per share on February 21, 2008.

91.     The Company's expectation, as stated by Defendant DeFeo on February 20, 2008, proved to be incorrect and, as described herein, the Company failed to properly and timely evaluate its assets in light of the declining global markets.

92.     The Company filed its Annual Report Form 10-K with the SEC on February 27, 2008. This Form 10-K was a fiduciary communication as it was incorporated into Plan documents. The Annual Report discussed the Company's policy regarding Goodwill and Impairment of Long Lived Assets. The Annual Report commented, in pertinent part, as follows:

> Goodwill - Goodwill represents the difference between the total purchase price paid in the acquisition of a business and the fair value of the assets, both tangible and intangible, and liabilities we acquired. *We review the value of our recorded goodwill annually, and more frequently as circumstances warrant, to determine if this value is potentially impaired.* The initial recognition of goodwill, as well as the annual review of the carrying value of goodwill, requires that we develop estimates of future business performance.
>
> Impairment of Long Lived Assets -- Our policy is to assess the realizability of our long-lived assets, including intangible assets, and to evaluate such assets for impairment whenever events or changes in circumstances indicate that the carrying amount of such assets (or group of assets) may not be recoverable. Impairment is determined to exist if the estimated future undiscounted cash flows are less than

the asset's carrying value. Future cash flow projections include assumptions regarding future sales levels, the impact of cost reduction programs, and the level of working capital needed to support each business. We rely on data developed by business segment management as well as macroeconomic data in making these calculations. There are no assurances that future cash flow assumptions will be achieved. *The amount of any impairment then recognized would be calculated as the difference between the estimated fair value and the carrying value of the asset.*

(Emphasis added).

93.    On or about March 31, 2008, Terex caused to be mailed to all Plan Participants a copy of its Proxy Statement for the Annual Meeting of Stockholders to be held on May 15, 2008, along with a copy of the Company's Annual Report to Shareholders. In addition to providing all Plan Participants with a hard copy of the Annual Report ("Participants in the Company's 401(k) plan will each receive a printed copy of the proxy materials," Proxy Statement at 4 of 67), the Proxy Statement also advised that the Annual Report was available online at www.proxyvote.com.

94.    The Annual Report, which was provided to all Participants with the 2008 Proxy Statement, stated in relevant part, in the Chairman's Letter:

So I end this letter as I began re-emphasizing our commitment to all who interact with Terex that we will continue to improve our Company, our products and services, and ourselves. *We will continue to provide updates on our progress in honest and forthright communications.* Although we remain proud of our historical achievements, we are more excited about our future opportunities to make a difference of our customers, our suppliers, our team members, our communities and, of course, our investors.

There are no guarantees in life. There are many risks and uncertainties that can pull us off course. You have my commitment, in any event, to lead Terex to even better performance tomorrow than today. *It may not be a straight line, but the trend is north and the pace is rapid.*

(emphasis added).

95. On April 23, 2008, the Company issued a Form 8-K, which incorporated as an exhibit a press release announcing Terex's results of operations and related financial information for the first quarter of 2008. This Form 8-K was a fiduciary communication as it was incorporated into Plan documents. The press release announced net income for the first quarter of 2008 of $163.3 million, or $1.59 per share, compared to net income of $113.8 million, or $1.09 per share, for the first quarter of 2007, an increase in earnings per share of 46%, and that net sales reached $2,362.7 million in the first quarter of 2008, an increase of 17.4% from $2,012.7 million in the first quarter of 2007.

96. Commenting on the results, the release, quoting in part Defendant DeFeo, stated in relevant part:

> "We are pleased with the first quarter's results, with both net sales and net income growth posting solid double digit percentage increases versus the prior year," commented Ron DeFeo, Terex Chairman and Chief Executive Officer. "The strength of international end markets and the continued strength of the domestic U.S. 'in-the-air' products yielded excellent results in our Aerial Work Platforms and Cranes business segments. Continued demand for commodities drove favorable results for our Materials Processing & Mining business segment. *The performance of the balance of our businesses, namely the Construction, Roadbuilding and Utility operations, were somewhat disappointing for the quarter. We believe, however, that the near term outlook is positive for the Construction segment, and that its operating margin will improve in the mid-year period and lead to good margin expansion on a year-over-year basis in 2008. In general, we think that all of our operations continue to have solid prospects heading into the remainder of the year."*
>
> * * *
>
> Commenting on future earnings potential, Mr. DeFeo continued, "In February, we provided earnings guidance for our 2008 performance, indicating that we anticipated earnings per share to be between $6.65 and $7.15 and net sales to be between $10.0 and $10.5 billion. Given our strong performance this quarter, balanced against the uncertainties surrounding some of our end markets and increased input costs, we now anticipate earnings per share for 2008 to be

towards the middle to high end of our previously announced range, or $6.85 to $7.15 per share, on net sales of $10.5 to $10.9 billion."

(Emphasis added).

97.     The April 23, 2008 Form 8-K also noted that the Company's backlog had increased 41% from the first quarter of 2007, and stood at $4.8156 billion.  This filing indicated that "meaningfully contributing to the increase was the Construction business, as that segment's backlog increased 48% over the prior year period, in response to strong Eastern European and Middle East demand, continued strong demand for material handlers in response to higher steel prices, and continued ramp-up challenges on certain product lines."

98.     Of the Company's RBUO and "Construction" segments, the April 23, 2008 release further stated:

> Construction: Net sales for the Construction segment for the first quarter of 2008 increased $40.5 million, or 9.9%, to $448.3 million versus the first quarter of 2007.  Excluding the translation effect of foreign currency exchange rate changes of $29.8 million and ASV sales since its acquisition of $21.3 million, net sales decreased approximately 2.6%.  The U.S. market remained relatively weak and the European market was moderately slower. This decline was mostly offset with positive developments in the Middle East and Eastern Europe.  Additionally, the larger construction-class off-highway truck business in Motherwell, Scotland experienced a slow-down in production rates due to challenges that arose during the shift to a mixed model production line. *This shortfall is expected to be temporary, and the net result of this activity is still expected to yield significant volume opportunity and cost reduction.*
>
> * * *
>
> Roadbuilding, Utility Products and Other: Net sales for the Roadbuilding, Utility Products and Other (RBUO) segment for the first quarter of 2008 decreased $9.6 million, or 5.4%, to $169.2 million versus the first quarter of 2007.  This is directly related to the decrease in concrete mixer truck demand resulting from continued softness in the North American housing construction market.  Additionally, the prior year's results reflected an unusual positive effect of the Tier III engine changeover which resulted in an elevated level of customer demand ahead of the introduction of

the higher cost, stricter emissions engine.  Order quoting activity remains strong for both the asphalt plant and utility product businesses and shipments are expected to increase in the second quarter.  The lower net sales volume in the first quarter of 2008 had a negative impact on Gross Margin and operating margin.  *The Company will continue to monitor the estimated fair value of the roadbuilding business for purposes of determining whether an impairment is evidenced.*

(Emphasis added).

99.     Following the announcement, the Company's stock price rose slightly from the previous day's closing price of $70.23 per share to close at $70.66 per share.

100.    On May 6, 2008, the Company filed its Form 10-Q Quarterly Report with the SEC. This Form 10-Q was a fiduciary communication as it was incorporated into Plan documents.  The filing addressed the Company's roadbuilding unit and indicated that the roadbuilding unit had passed a goodwill impairment test and that no impairment charge was being recorded.  The Form 10-Q stated in relevant part:

The Company updated its forecast to address the impact of changes in business conditions and performed a goodwill impairment test as of March 31, 2008 for the roadbuilding reporting unit.  *The roadbuilding reporting unit passed the test and no impairment charge was recorded.*  The Company will continue to monitor the estimated fair value of the roadbuilding business for purposes of determining whether impairment is evidenced.

(Emphasis added).

101.    On July 23, 2008, the Company issued a Form 8-K, which incorporated as an exhibit a press release announcing Terex's results of operations and related financial information for the second quarter of 2008.  This Form 8-K was a fiduciary communication as it was incorporated into Plan documents.  Commenting on the results, the release, quoting in part Defendant DeFeo, stated:

Mr. DeFeo concluded, "Our global and product diversification has allowed the Company to perform well despite the difficult economic

conditions in the U.S., softening of the markets in Western Europe and increasing input costs. *Demand remains strong for many of our products,* and we are continuing to invest in our business for today and tomorrow, particularly in developing markets such as China and India. We expect world demand for infrastructure, energy and mining products to continue, while at the same time we are positioning our businesses for the eventual recovery in the U.S. market. We remain confident in our ability to achieve our previously stated goal of '12 by 12 in 10', which is $12 billion in revenues with a 12% operating margin by 2010. By quickly adapting to changing market conditions in all of our segments and geographies, we are showing that we can provide products that meet our customers' needs worldwide, and at the same time improve our financial performance and invest in growth for the Company."

(Emphasis added).

102.    The July 23, 2008 Form 8-K also noted that the "Construction segment backlog decreased 2.6% versus the comparable prior year period and decreased 26.5% as compared to March 31, 2008. Slowing compact construction demand in Western Europe, combined with the easing of some supplier constraints (which allowed for increased production levels), contributed to the decreased backlog" and that "Roadbuilding, Utility Products and Other (RBUO) segment backlog declined 12.6% versus June 30, 2007 and declined 6.2% as compared to March 31, 2008, as concrete mixer truck orders slowed."

103.    Of the Company's RBUO and Construction segments, the July 23, 2008 press release further stated:

Construction: Net sales for the Construction segment for the second quarter of 2008 increased 23.6% to $620.9 million versus the second quarter of 2007. Excluding the translation effect of foreign currency exchange rate changes of approximately $44 million and acquisition related sales during the second quarter of 2008 of $58.5 million, net sales increased approximately 3% versus the prior year period.

Weakness in the U.S. construction market continued during the second quarter of 2008, while compact construction equipment sales slowed in Western Europe. Demand remains solid for rigid frame dump trucks as well as material handlers (a product used by scrap steel yards). Additionally, demand trends in developing markets

remain favorable for Construction, particularly in the Middle East, Africa, and Eastern Europe.

* * *

Roadbuilding, Utility Products and Other: Net sales for the RBUO segment for the second quarter of 2008 increased 13.3%, to $191.3 million, versus the second quarter of 2007. Excluding the translation effect of foreign currency exchange rate changes, net sales increased approximately 11%. The Utility Products, Roadbuilding and Government Programs businesses all witnessed sales growth, although concrete mixer truck sales were essentially flat when compared to the second quarter of 2007.

Trends in the Company's Utility Products business are positive. Roadbuilding net sales remained soft, as U.S. infrastructure spending remains weak, resulting in the continued implementation of cost containment strategies within this business. The Company will continue to monitor the estimated fair value of the Roadbuilding business for purposes of determining whether a goodwill impairment is evidenced.

RBUO operating margin was 5.1% in the second quarter of 2008 versus 2.4% for the comparable period in 2007. Increased volume combined with cost containment, particularly manufacturing efficiencies recognized within the Utility Products business, resulted in improved operating margin for the entire segment.

104.    When the Company filed its Form 10-Q Quarterly Report with the SEC on August

1, 2008, the Company, as it had stated in its May 6, 2008 SEC filing, addressed the roadbuilding

unit and stated, again, that the roadbuilding unit had passed a goodwill impairment test and that

no impairment charge for the unit was being recorded.  The August 1, 2008 Form 10-Q stated that:

The Company updated its forecast to address the impact of changes in business conditions and performed a goodwill impairment test as of June 30, 2008 for the roadbuilding reporting unit. *The roadbuilding reporting unit passed the test and no impairment charge was recorded.* The Company will continue to monitor the estimated fair value of the roadbuilding business for purposes of determining whether impairment is evidenced.  The amount of goodwill recorded for the roadbuilding reporting unit as of June 30, 2008 was $39.7.

(Emphasis added).

**The Company Begins To Acknowledge a Significant Problem With Impaired Assets**

105.    The Company's guidance and reports through the first seven months of 2008 artificially inflated the Company's stock and failed to accurately account for the reality that the Company was experiencing serious financial problems resulting, in part, from the overall slowdown in residential and commercial construction.   In fact, as the Company would soon acknowledge, it was carrying assets at materially inflated values on its balance sheet.

106.    On September 4, 2008, the Company issued a Form 8-K which incorporated as an exhibit a press entitled "Terex Updated 2008 Earnings Guidance and Confirms Terex Investment Analyst Meeting."  This Form 8-K was a fiduciary communication as it was incorporated into Plan documents.  It stated in relevant part:

> [T]he Company is updating 2008 full year guidance and providing quarterly guidance due to changing market conditions.  Full year 2008 earnings per share are expected to be between $6.35 and $6.65 compared to $5.85 for the full year 2007, a 9% to 14% increase. Net sales for 2008 are expected to be in the range of $10.2 to $10.6 billion.  This guidance compares to the previously announced range for 2008 earnings per share of $6.85 to $7.15 and net sales of $10.5 to $10.9 billion.
>
> Earnings per share are expected to be between $1.26 and $1.38 for the third quarter of 2008 and between $1.20 and $1.33 in the fourth quarter of 2008.   This outlook reflects an effective tax rate of approximately 33% and the continued benefit of reduced share count from the Company's share repurchase program.  All per share amounts are on a fully diluted basis.
>
> "While our Cranes and Materials Processing & Mining segments continue to perform better than our expectations, continued market softening and input costs in the Aerial Work Platforms and *Construction segments in Western Europe and the United States are expected to more than offset those positive factors*," commented Ron DeFeo, Terex Chairman and Chief Executive Officer.

(Emphasis added).

107.    Terex stock plummeted on the news about the "market softening" in the Construction segment, falling 19.6% from the prior day's closing price, or $9.30 per share, to close at $38.02 per share, down from $66.24 of the beginning of the Relevant Period.

108.    On September 8, 2008, an article in *Investopedia*, entitled "Terex Weakness Stokes Global Growth Fears," spoke to the significance of Terex's September 4, 2008 announcement. The article stated, in relevant part:

> Terex lowered its earnings forecast for 2008 Thursday, sending shares down nearly 20% and causing market-topping losses for rivals Caterpillar (NYSE:CAT) and CNH Global (NYSE:CNH)on an downright brutal day on Wall Street. But is this a warning for the whole industry, or does Terex deserve to swim alone?
>
> Terex now sees net earnings for 2008 to be between $6.35-6.65 per share, down from the $6.85-7.15 the company confirmed just over a month ago. The new estimates would represent 10-14% growth year-over-year. Terex is seeing further deterioration in Western Europe and the U.S., especially for its Aerial Work Platforms (AWP) and Construction segments.

109.    The September 8, 2008 article also noted that Terex's business model was significantly less diversified than that of one its major competitors, Caterpillar:

> Even though both Caterpillar and Terex do more than 50% of business overseas, Caterpillar has a much more diversified market base. In the second quarter, Caterpillar grew sales by 50% in the Asia/Pacific region and 27% in Latin America, two areas vastly underserved by Terex. While Caterpillar now generates about 35% of sales from these two world regions, Terex stands below 25%.
>
> * * *
>
> Caterpillar has completely bucked the cyclical trends that have defined its past, and still appears to be the most balanced and diversified company in the global arena. This diversification comes from not just geography, but a rapidly increasing service package that includes replacement parts, logistics, and rail services.

110.    As a result of the continued deterioration in Terex's construction and roadbuilding lines, analysts at Wachovia Securities downgraded Terex's stock on October 3, 2008. On that day,

Terex stock closed at $23.67 per share, significantly down from its price at the beginning of the Relevant Period.

111.    As of October 1, 2008, the Company performed, but did not at the time disclose, an annual goodwill impairment test, "which resulted in a non-cash impairment charge for goodwill of $459.9 million, which represented all of the goodwill recorded in the Construction and RBUO segments." The results of this test were not disclosed to Plan Participants for almost five months, at which time the Company filed a form 10-K with the SEC on February 27, 2009. Defendants/fiduciaries could and, consistent with ERISA, should have taken steps to protect the Plan's Participants—at the very least freezing Company stock as a Plan investment option—but did not do so.

112.    On October 22, 2008, the Company issued a Form 8-K which incorporated as an exhibit a press release announcing Terex's results of operations and related financial information for the third quarter of 2008: This Form 8-K was a fiduciary communication as it was incorporated into Plan documents. The press release stated in relevant part:

> Ron DeFeo, Terex Chairman and Chief Executive Officer, stated, "While we continue to make progress on our improvement initiatives, the current environment is challenging, marked by a continued global credit crisis and worsening economic conditions, particularly in the U.S. and Western Europe. Input costs continue to present challenges for us, although we expect these to moderate over time. At this time, our price increases have not yet fully offset our total material cost increases. We are taking aggressive actions to better position the Company for the expected reduced net sales levels of the next twelve months, in particular in the AWP, Construction, and Materials Processing businesses. At the same time, we are continuing to invest in developing markets and our improvement initiatives, as well as increasing Cranes and Mining capabilities to meet the growing demand in those areas."
>
> Mr. DeFeo continued, "We expect 2009 net sales, including the effect of announced acquisitions, to be similar to 2008 full year net sales, driven by continued strong results in Cranes and Mining, offset by lower net sales in AWP, Materials Processing and

Construction. The Cranes and Mining businesses continue to grow, in particular in developing markets, where we expect current positive trends to continue. Beginning in the fourth quarter of 2008, for the next twelve months we expect net sales for AWP to be down 30%-40%, for Materials Processing to be down 15%-20% and for Construction to be down 25%-35% versus the prior twelve month period. In light of these overall expectations, we have taken or initiated several actions to properly size our organization and production levels. Additionally, we have further heightened our focus on cash generation during this time of uncertain access to credit."

* * *

Mr. Widman continued: "*With the actions we are taking to reduce costs and maintain liquidity*, we expect to have sufficient flexibility to execute our key business plans."

(Emphasis added).

113.    Of the Company's RBUO and Construction segments, the October 22, 2008 press release further stated:

> Construction: Net sales for the Construction segment for the third quarter of 2008 increased 4.9% to $474.2 million versus the third quarter of 2007. Excluding the translation effect of foreign currency exchange rate changes of approximately $16 million and acquisition related net sales during the third quarter of 2008 of approximately $49 million, net sales decreased approximately 10% versus the prior year period.
>
> Commercial construction remains weak in North America and continues to weaken in Western Europe, resulting in lower net sales for compact construction equipment. Developing market demand remains strong, particularly in Africa, the Middle East and Eastern Europe, but is not of significant scope to offset the weakness in developed markets. Large infrastructure and mining projects continue to demand rigid frame dump trucks.
>
> *Construction experienced a negative operating margin of 6.0% for the third quarter of 2008 as compared to a positive operating margin of 3.1% for the comparable period in 2007.* The operating loss was due to increased input costs combined with lower net sales volume (excluding the impact of acquisitions). Pricing actions have been taken to offset input cost increases and the recent volatility in steel pricing has begun to moderate, but slowing demand in

developed markets has resulted in production cuts and reductions in employment levels. *Given the near term performance, the Company will continue to monitor the estimated fair value of the Construction business for purposes of determining whether a goodwill impairment is evidenced.*

* * *

Roadbuilding, Utility Products and Other: Net sales for the RBUO segment for the third quarter of 2008 increased 17.7%, to $175.3 million, versus the third quarter of 2007. Excluding the translation effect of foreign currency exchange rate changes, net sales increased approximately 14%. The Utility Products, Roadbuilding and Government Programs businesses all witnessed net sales growth.

* * *

*Due to the low level of road building and infrastructure funding in the U.S., the Company remains cautious regarding the sales outlook for Roadbuilding, and management continues to execute cost containment strategies within this business. The Company will continue to monitor the estimated fair value of the Roadbuilding business for purposes of determining whether goodwill impairment is evidenced.*

RBUO operating margin was 2.4% in the third quarter of 2008 versus an operating loss of 1.7% for the comparable period in 2007. Increased volume for Utility Products and the Brazilian based road building operation contributed to stronger margins for the third quarter of 2008. A bad debt charge of approximately $4 million was incurred in the comparable period in 2007, for the Company's re-rental operation, a business that has since been wound down.

(Emphasis added).

114.    In response to the various negative items disclosed on October 22, 2008, the Company's stock plummeted, falling $4.03, or 24%, to $12.69 per share over the next two days.

115.    On November 3, 2008, the Company filed its Form 10-Q Quarterly Report with the SEC. This Form 10-Q was a fiduciary communication as it was incorporated into Plan documents. In this filing, the Company again announced on November 3, 2008 that no charge against earnings was being recorded for its roadbuilding and construction units. The filing stated in relevant part:

The Company updated its forecast to address the impact of changes in business conditions and performed a goodwill impairment test as of September 30, 2008 for the roadbuilding and construction reporting units. *The Company's assessment of the roadbuilding and construction reporting units' goodwill resulted in no impairment being evidenced at September 30, 2008. The Company will continue to monitor the estimated fair value of the roadbuilding and construction businesses for purposes of determining whether impairment is evidenced. The amount of goodwill recorded for the roadbuilding and construction reporting units as of September 30, 2008 was $52.6 and $364.2, respectively.*

(Emphasis added).

116.     On February 3, 2009, the Company issued a Form 8-K, which incorporated as an exhibit a press release entitled "Terex Corporation Updates Guidance for 2008; Announces Conference Call on 2008 Results."   This Form 8-K was a fiduciary communication as it was incorporated into Plan documents.  The press release stated in relevant part:

> *Although not yet finalized, the Company expects to record a non-cash impairment charge of certain of the Company's goodwill, identifiable intangibles and other non current assets principally related to its Construction, Roadbuilding and Utilities businesses. **This impairment charge is estimated to be approximately $600 million***, only a portion of which will be tax affected. We are currently in compliance with all of the financial covenants under our bank credit facilities and indentures and this impairment charge will not affect our compliance.

> Commenting on the new guidance, Terex Chairman and Chief Executive Officer Ron DeFeo said, "Our fourth quarter 2008 results were affected by the rapid change in global economic conditions more than we anticipated, as well as continued input cost pressure. *We continue to feel the negative effect that credit availability has on customer sentiment and demand for our products,* particularly in our Construction, Materials Processing and Aerial Work Platforms businesses, as well as our smaller crane and tower crane product lines."

> Mr. DeFeo continued, "In response to the present economic environment, we are taking and will continue to take aggressive actions to reduce costs and inventories in all of our businesses. *We feel we have responded appropriately with significant actions already in progress, many of which we began late last summer and*

> *fall.* Our actions include reductions in force, significantly curtailed
> production schedules in affected businesses, including temporary
> and permanent factory shutdowns, facility consolidations, the
> rescheduling of incoming raw materials and reducing executive
> compensation costs."

(Emphasis added).

117.    More bad news followed soon after.  On February 11, 2009, the Company issued a Form 8-K, which incorporated as an exhibit a press release entitled "Terex Corporation Updates Guidance for 2008; Announces Conference Call on 2008 Results."  This Form 8-K was a fiduciary communication as it was incorporated into Plan documents.  The press release announced a net loss for the fourth quarter of 2008 of $421.5 million, or $4.46 per share, including a pre-tax non-cash charges of $459.9 million, or $4.84 per share, for the impairment of goodwill in the Company's Construction, Roadbuilding and Utility Products businesses.

> Ron DeFeo, Terex Chairman and Chief Executive Officer, stated,
> "This past year has been like no other – the first half of the year
> exhibited robust growth and expansion, while the second half of the
> year was severely impacted by the global credit crisis and economic
> deterioration, which drove significant declines in customer demand
> in our businesses.
>
> Mr. DeFeo continued, "Given the current market conditions, it is
> difficult to project 2009 performance with a reasonable degree of
> certainty. However, *we are planning for continued softness in*
> *demand. We are experiencing increasing levels of cancellations in*
> *our backlog for crane and mining products, as well as delays in*
> *acceptance of deliveries, as our customers in these areas are not*
> *immune to the effects of the global economic downturn. Based on*
> *what we know today, we expect our net sales for 2009 to decline by*
> *30% to 35% from 2008.*

(Emphasis added).

118.    With regard to the Company's backlog, the February 11, 2009 press release stated that backlog had fallen 18.5% compared to the prior year and that it stood at $2.96 billion.  The decrease was admitted by the Company to be due, in large part, to a significant reduction in orders

for the Construction business, which the release noted as "decreased 64.8% versus the comparable prior year period and decreased 45.1% as compared to September 30, 2008, *primarily due to a significant reduction in construction activity in most end markets for this segment's products.*" (Emphasis added). Similarly, the February 11, 2009 filing admitted that RBUO "backlog declined 24.7% versus December 31, 2007 and declined 17.4% as compared to September 30, 2008, mainly due to *reduced demand* for North American asphalt plants and concrete mixer trucks." (Emphasis added).

119.  Of the Company's RBUO and "Construction" segments for the prior quarter, the February 11, 2009 release further acknowledged:

> Construction: Net sales for the Construction segment for the fourth quarter of 2008 decreased $202.2 million, or 37.0%, to $343.9 million versus the fourth quarter of 2007. Excluding the translation effect of foreign currency exchange rate changes and acquisition related net sales during the fourth quarter of 2008, *net sales decreased approximately 34% versus the prior year period.* Weakness in Western Europe that developed very quickly during the third quarter of 2008 and continued into the fourth quarter was the primary driver of lower net sales. *Demand for construction equipment remained soft as residential and non-residential construction experienced increasing weakness globally.*
>
> In the fourth quarter of 2008, *Construction experienced an operating loss of $66.8 million, excluding impairment charges of $364.4 million, as compared to operating income of $12.5 million for the comparable period in 2007.* Lower volume and, to a lesser extent, higher input costs, mainly steel, and costs associated with reductions in production levels, primarily drove the decrease as compared to the fourth quarter of 2007.
>
> \* \* \*
>
> *Effective January 1, 2009, the Roadbuilding businesses will be consolidated within the Construction segment, the Utility Products businesses will be consolidated within the AWP segment and the RBUO segment will cease to be a reportable segment.*

(Emphasis added).

120.     The February 11, 2009 disclosure also noted:

> Credit Agreement – The Company generated $218.8 million of cash from operating activities during the fourth quarter of 2008, and had approximately $484 million of cash and cash equivalents at December 31, 2008.  Despite the positive generation of cash during the fourth quarter, ***continued deteriorating business conditions in certain of the Company's operating segments and the impact of historical fixed charges incurred on a trailing twelve months basis*** (for example, interest expense, cash taxes, share repurchases and capital expenditures) ***may likely cause the Company to be in violation of the consolidated fixed charge coverage ratio covenant under its credit agreement as early as the end of the first quarter of 2009***. As a result, the Company has initiated discussions with its lead banks seeking to obtain a consent and/or amendment to its credit agreement. The Company will endeavor to obtain the consent and/or amendment during the first quarter of 2009 in order to avoid any potential default under the credit agreement.  ***Should the Company not be able to obtain such consent or amendment, there could be adverse consequences to the Company's liquidity.*** (Emphasis added)

In other words, Terex's fate, to a large extent, was in the hands of its banks.

121.     Following the February 11, 2009 disclosures, the Company's stock price fell $4.17, or 30.6%, to close at $9.45 per share.

122.     During the Company's Fourth Quarter 2008 earnings conference call, Defendant DeFeo admitted that Terex's "12 by 12 and 10 goals, $12 billion in revenue with 12% margins by 2010 will not be achieved without an unlikely miracle turn around."

123.     On February 27, 2009, the Company filed a Form 10-K with the SEC which stated, with regard to the $459.9 million asset impairment charge that:

> As of October 1, 2008, we performed our annual goodwill impairment test, which resulted in a non-cash impairment charge for goodwill of $459.9 million, which represented all of the goodwill recorded in the Construction and RBUO segments.  However, we do not believe that non-cash impairment charges are indicative of returns on our invested capital.  Therefore, we have excluded the effect of these impairment charges from the metrics used in our calculation of ROIC.

124. A *Dow Jones Factiva* article entitled "Month to February 27: Terex Corporation trails 93.7% of stocks, price 46.6% below volume weighted price" reported that "Terex Corporation (TXG.F) crashed Euro4.65 (or 41.7%) to Euro6.50 in the month ending February 27. In the German market of 9,443 stocks, the stock has a 6-month relative strength of 6 *indicating it is trailing 94.0% of the market*. The stock fell for a second month in February. Compared with the DAX index which fell 479.7 points (or 11.1%) in the month, this represented a relative price change of -30.6%." (Emphasis added).

125. This decrease in the value of the Company's stock was caused by previously-undisclosed problems in the Company's Construction and RBUO segments which were known or should have been known by Defendants/fiduciaries by the beginning of the Relevant Period and were "probable" and "reasonably estimable." Instead of making disclosures when "there [was] at least a reasonable possibility that a loss or an additional loss may have been incurred," as required by FASB 5, the Company chose to only do so annually. Defendants imprudently and disloyally continued to allow Terex stock to be offered as a Plan investment option despite the high probability that the Company's assets were materially overstated and had been for many months.

126. As a result of the Company's severe problems as described above, the Company's stock, which had been trading at $66.24 per share on January 2, 2008, the first trading day of the Relevant Period, declined to a closing price of $8.92 per share on February 27, 2009, a decrease of $57.32 per share, or over 86.5%, thereby greatly diminishing the retirement benefits of Plaintiffs and the Plan. Meanwhile, the Plan's fiduciaries, despite having fiduciary duties and unfettered discretion to protect the retirement savings of Plan participants, did not fulfill their duties under ERISA to protect the retirement savings of the Participants.

**Post-Relevant Period Reports Confirm That Terex Stock Was**
**An Imprudent Retirement Investment During The Relevant Period**

127. The scope of Terex's problems during the Relevant Period is confirmed by post-Relevant Period disclosures. Defendants have since admitted that Terex's short-term outlook was very challenging, that Terex was in survival mode in navigating unchartered waters and making difficult decisions. These are not indicative of normal day-to-day problems at a Company, but of franchise-threatening events. For example:

a. At the ISI Industrial Investor Conference on March 3, 2009, Defendant DeFeo recognized that "in the short term, the outlook is, as everyone knows, very challenging[,]" and that "what you do in this environment is, you manage for cash. And in managing for cash, you pay attention to all the details. And you **go after every opportunity that you can to position yourself for survival** and for capitalizing on the near term opportunities that in whether it's six months or 12 months will present themselves. Having cash is the key to **survivability** and value creation, in my mind." (Emphasis added).

b. In Terex's first quarter 2009 earnings conference call on April 22, 2009, there was a significant focus on survival. Defendant DeFeo recognized that Terex would "be driven by how do you manage for cash and how do you get the company positioned to survive the downturn because nobody knows how long it is and nobody knows how deep it is[.]" He also recognized that "[p]art of winning is to assure survival and to harden capabilities in key areas of cash and cost management. **We feel that Terex will survive** and prosper as we **navigate these unchartered waters**, and I think we will cover some of that in some depth over the course of this call." (Emphasis added).

c. In Terex's third quarter 2009 earnings conference call on October 22, 2009, Defendant DeFeo recognized that Terex's executives were "managing the business for cash

and we really feel this has been appropriate. That means focusing on the things that will keep us alive and get ourselves organized for growth in the future."

d.      In Terex's presentation at the Robert W. Baird & Co Industrial Conference on November 11, 2009, Defendant Widman stated "we are in tough times as everyone knows. We made a lot of tough choices over the ***past year and a half*** in terms of reducing our headcount, focusing our operations on sustainability and survivability.  Earlier in the year, ***we structured our capital market activity to provide a level of certainty of survival***. And I think we are well on our way to that, in terms of our balance sheet structure, with cash of over $1 billion, access to revolver close to $500 million and no earnings-related covenants until mid-2011." (Emphasis added).

128.    On August 12, 2009, the SEC filed a Complaint in this Court (*Securities and Exchange Commission v. Terex Corporation*, 3:09civ1281(AWT) (the "SEC Action")) alleging that "Terex aided and abetted [] fraudulent accounting by [United Rentals, Inc. (URI)] for two year-end transactions that were undertaken to allow URI to meet its earnings forecasts. These fraudulent transactions also allowed Terex to prematurely recognize revenue from its sales to URI."  Terex agreed to settle the charges on the day they were filed and to pay a penalty of $8 million.

129.    The SEC action alleged that "from 2000 through June 2004, Terex's accounting staff failed to resolve imbalances arising from certain intercompany transactions. Instead of investigating and correcting the imbalances, Terex offset the imbalances with unsupported and improper entries. As a result, costs were not recorded as expenses, and, on a consolidated basis, Terex      appeared      to      be      more      profitable      than      it      was." www.sec.gov/litigation/litreleases/2009/lr21177.htm

130.     Additionally, on July 13, 2010, *24/7 Wall St.* published an article entitled "The 24/7 Wall St. Fifty Least Trustworthy Companies in America, A Look Back" which listed Terex as among the 25 least transparent large-caps, noting that the Company's appearance on the list was indicative of "poor disclosure, accounting, and governance practices" and noting that the Company was generally "viewed by Wall St. as [a] poor investment[]."[6] *24/7 Wall St.* also noted, in another article regarding "The 25 Least Transparent Large-Caps," ranking Companies with the least transparent governance and accounting practices as of year-end 2009 had flagged 13 of Terex's metrics, seven relating to governance and six relating to accounting.[7]

## BREACHES OF FIDUCIARY DUTY

131.     As required by ERISA, Defendants issued one or more SPDs, each of which either referred to or incorporated by reference the documents filed by Terex with the SEC under the federal securities laws.

132.     The October 2002 SPD, which was the operative SPD at the start of the Relevant Period, stated that:

> The Securities and Exchange Commission (SEC) *allows* Terex to "incorporate by reference" into this prospectus the information it files with the SEC, which means:
>
> - Incorporated documents are considered part of this prospectus,
>
> - *Terex can disclose important information to you by referring you to those documents*, and

---

[6] http://247wallst.com/2010/07/13/the-247-wall-st-fifty-least-trustworthy-companies-in-america-a-look-back/

[7] http://247wallst.com/2010/06/07/the-247-wall-st-fifty-least-trustworthy-companies-in-america/

- *Information Terex files with the SEC will automatically update and supersede the information in this prospectus, including the previously incorporated documents.*

Terex incorporates by reference the documents referred to in Item 3 of Part II of the Registration Statement on Form S-8 of Terex relating to the Plan. Terex will provide without charge to each person, including any beneficial owner, to whom this prospectus is delivered, upon the written or oral request of such person, a copy of any such document (other than exhibits to such documents unless such exhibits are specifically incorporated in this document by reference) and the documents to which employees may be entitled pursuant to Rule 428(b) of the Securities Act of 1933, as amended.

*All documents hereafter filed by Terex pursuant to Section 13(a), 13(c), 14, or 15 (d) of the Securities Exchange Act of 1934, as amended, prior to the filing of a post-effective amendment to the Form S-8 which indicates all securities offered have been sold or which deregisters all securities then remaining unsold, shall be deemed to be incorporated by reference in this prospectus and to be a part hereof from the date of the filing of such documents.*

You may obtain a copy of any of these documents without charge by writing to Terex Corporation, c/o Human Resources Department . . . .

(Emphasis added).

133. A subsequent September 2007 SPD advised Plan Participants of substantially the same information.

134. These incorporated filings, however, contained numerous material misrepresentations and omitted to state material facts that were necessary to make the statements which were made not misleading. The fiduciary communications sent to Plan participants did not provide complete and accurate information regarding the risk and return profile of the Fund, including that: (a) during the Relevant Period the Company improperly accounted for impaired assets in its RBUO and Construction segments; (b) during the Relevant Period the Company's RBUO and Construction assets were impaired and were carried on the books and records of Terex, and reported in Terex's published financial statements, at values far in excess of the correct or fair

carrying value of those assets; (c) during the Relevant Period, the Company's inflated asset values required a substantial write-down of RBUO and construction assets; (d) during the Relevant Period, the Company was experiencing significant undisclosed problems, including diminished customer demand for the Company's products, cancellations of orders and delays in acceptances of deliveries by customers due, in part, to the subprime mortgage crisis and tightening of credit in the United States and other Company markets, and related softness in residential and commercial construction projects; and (e) the aforesaid significant undisclosed problems which were being experienced by the Company during the Relevant Period, *inter alia*, caused the Company's stock price to suffer as the truth became known.

135. Plaintiffs do not herein allege that the Company's SEC filings, *qua* SEC filings, were fiduciary communications. However, as the Solicitor General and the Solicitor of Labor asserted in their brief to the Supreme Court in the Brief for the United States as *Amicus Curiae* in *Fifth Third Bancorp v. Dudenhoeffer*, No. 12-751 (the "*Fifth Third Amicus*"),[8] the incorporation of material misrepresentations contained in SEC filings into a SPD is actionable under ERISA. *Id.* at 20-23; *accord Rinehart v. Akers*, 722 F.3d 137, 152 (2d Cir. 2013) (overruled in part on other grounds) (persons "act[] as ERISA fiduciaries when they incorporate[] [an employer's] SEC filings into the SPD distributed to plan-participants.")

136. Defendants were not obligated by ERISA or by the Plan to discharge their duty to provide complete and accurate information to Participants through the mechanism of incorporation of SEC filings. Defendants could have fulfilled this duty by setting forth sufficient and accurate information in the SPDs themselves or in other communication to participants, such as quarterly account statements and newsletters. Defendants chose, however, to adopt the mechanism of

---

[8] http://www.dol.gov/sol/media/briefs/dudenhoffer(A)-11-01-2013.pdf

incorporation of SEC filings into the SPDs, and the SEC filings contained materially inaccurate and/or misleading information that caused loss to the Plan and the Participants as set forth above.

137.    At all relevant times, Defendants should have known of the material misrepresentations and omissions, including those filed with the SEC and incorporated by reference in the SPDs.  Nevertheless, the Committee, as Plan Administrator, chose to incorporate SEC filings by reference into the SPDs.  By so incorporating, the SEC filings "bec[a]me constructive a part of the [SPD], and in that respect the two form[ed] a single instrument." *Fifth Third Amicus* at 21 (quoting Richard A. Lord, Williston on Contracts § 30:25, at 304 (4th ed. 2012).  It is based upon the SPDs—the instrument that Defendants created in their fiduciary capacity—that Plaintiffs' claims are brought, and are brought upon Terex's corporate SEC filings only insofar as those documents are incorporated by reference into fiduciary communications such that they became fiduciary communications.

## MISMANAGEMENT OF PLAN ASSETS

138.    Pursuant to ERISA Section 404(a), 29 U.S.C. § 1104(a), at all times relevant to this Complaint, Defendants had a duty to discharge their duties with respect to the Plan with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and of like aims, and to diversify investments in the Plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so.

139.    Defendants breached their fiduciary duties in that they knew or should have known the facts alleged above, and/or knew or should have known that the Plan should not have invested in Terex common stock during the Relevant Period.

## **CAUSATION**

140.     Terex's stock price collapse of over 86.5% devastated the Plan's assets and could and would have been avoided in whole or in part by Defendants complying with their ERISA fiduciary duties, which fiduciary duties included the options to, for example and not as an inclusive list: investigating whether Terex was a prudent retirement investment; retaining outside advisors to consult them or to act as fiduciaries; seeking guidance from governmental agencies (such as the Department of Labor or Securities & Exchange Commission); resigning as fiduciaries of the Plan pursuant to Plan § 3.01; stopping or limiting additional purchases of Terex by the Plan; and/or making a complete and appropriate disclosure of the facts above.

141.     Despite these and other options, Defendants—who knew or should have known that Terex was an imprudent retirement investment—choose to, as fiduciaries, ignore the size of the Plan's investment in Terex stock and to continue allowing the Plan to acquire further Terex stock, while taking no action to protect their wards as Terex's condition worsened and the Plan's Participants' retirement savings were decimated.  Prudent fiduciaries would have acted otherwise and taken appropriate actions to protect the Plan and its Participants.

142.     The Plan suffered tens of millions of dollars in losses because substantial assets of the Plan were imprudently invested, or allowed to be invested by Defendants, in Company securities during the Relevant Period, in breach of Defendants' fiduciary duties.  These losses were reflected in the diminished account balances of the Plan's Participants.

143.     Defendants failed to accurately apprise the Participants of the problems within the Company (as set forth above) and of the fact that Company stock was generally an imprudent investment option due to, *inter alia*, numerous undisclosed problems, which once revealed, caused the Company's stock price to suffer.   Moreover, as further described above, Defendants

misrepresented the soundness of Company securities as an investment vehicle by allowing the Plan to hold Terex's common stock. As a consequence, regardless of any ability to divest, participants did not exercise independent control over their investments in the Company securities, and Defendants remain liable under ERISA for losses caused by such investment.

144. Had the Defendants properly discharged their fiduciary and/or co-fiduciary duties, the Plan and Participants would have avoided a substantial portion of the losses that they suffered through their continued investment in Company stock. As succinctly stated by the court in an analogous action, while "[d]isclosure might not have prevented the Plan from taking a loss on [company] stock it already held; but it would have prevented the Plan from acquiring (through Plaintiffs' uninformed investment decisions and through continued investment of matching contributions) additional shares of overpriced [company] stock: the longer the fraud continued, the more of the Plan's good money went into a bad investment; and full disclosure would have cut short the period in which the Plan bought at inflated prices." *In re Honeywell Int'l ERISA Litig.*, No. 03-1214 (DRD), 2004 U.S. Dist. LEXIS 21585, at *42-*43 (D.N.J. Sept. 14, 2004).

145. Despite their fiduciary duties, Defendants failed to protect the Participants' retirement savings from being imprudently invested in Terex stock, and as a result, the Plan and the Participants suffered substantial losses. A prudent fiduciary facing similar circumstances would not have stood idly by, as Defendants did here, while the Plan lost millions of dollars through continued investing in additional imprudent Terex common stock. Instead, Defendants allowed the Plans to purchase hundreds of thousands of shares according the Plan's Forms 11-K:

| Date | Terex Common Stock held by the Plan, per Form 11-k | share price | approximate number of shares |
|---|---|---|---|
| 12/31/2007 | $91,561,654.00 | $65.57 | 1,396,395.52 |
| 12/31/2008 | $32,249,487.00 | $17.32 | 1,861,979.62 |
| 12/31/2009 | $50,102,852.00 | $19.81 | 2,529,169.71 |

146.    The following alternative options—which are pled as alternative statements under Fed. R. Civ. P. 8(d)(2) to the extent they are inconsistent— were available to Defendants and (a) could have been done without violating securities laws or any other laws; (b) should have been done to fulfill Defendants' fiduciary obligations under ERISA and (c) would not have been more likely to harm the Fund than to help it.

**Alternative One: Contribute Cash Instead of Stock to the Plan**

147.    As quoted above, Plan Section 5.02 states that "Matching Contributions . . . may be made in cash or in 'qualifying employer securities' as that term is defined in section 406(a)(1)(E) of ERISA." Terex was thus given complete discretion by the Plan as to the form of its matching contribution.

148.    The Plan's 2008 and 2009 11-K Forms 11-K[9] both state that "Company contributions are made in Terex common stock, $.01 par value per share ('Common Stock')." 2008 11-K at 6; 2009 11-K at 6.

149.    The decision whether to contribute cash or stock was a exercise of "any authority or control respecting management or disposition of its assets," so it was a fiduciary decision under ERISA. 29 U.S.C. § 1102 (21)(A)(i). Thus a fiduciary decision was made by Terex to contribute highly risky, artificially inflated Terex stock to the Plan. This was a breach of fiduciary duty by Terex.

150.    As a result of this matching decision in Terex stock, a significant amount of Terex stock ($11,824,413 in 2008, and $10,355,634 in 2009, at least some of which was likely invested

---

[9] www.sec.gov/Archives/edgar/data/97216/000009721610000135/f11k06282010.htm.

in the Plan during the Relevant Period)[10] was deposited into the Plan in the form of highly risky, artificially inflated Terex common stock.  2008 11-K at 4, 2009 11-K at 4.

151.    Matching contributions were earned compensation, not gifts,[11] that could have and should have been made in cash and pro-rated based upon participants' investment instructions, as the Plan permits.

152.    To the best of Plaintiffs' knowledge, no disclosure would have been required had the matching contribution, which was made in Terex stock, been made in cash instead.

**Alternative Two: Freezing Company Stock Purchases**

153.    Including matching contributions, there were $15,581,766 in new contributions invested in Terex common stock in the Plan in 2008, and an additional $11,767,063 was invested in Company stock from contributions previously made to the Plan, presumably from the sale of other investment options.  2008 11-K at 10.  Thus, in addition to the decision to match in Terex stock instead of cash as discussed above, $15,524,416 was used to purchase Company stock through the Fund in 2009.

154.    Plan Section 6.05 directs that "[t]he Administrative Committee shall have the authority to offer an Investment Fund which *may* invest up to 100% of the fair market value of its assets in 'qualifying employer securities' as that term is defined in ERISA." (emphasis added).

---

[10] The Relevant Period ends on February 27, 2009, so it comprises 58 of 265 days.  Assuming that the Company's contributions were distributed equally throughout the year, there would have been $1,645,552.80 contributed during the Relevant Period in 2009, and addition to the contributions in 2008, for a total of $13,469,965.80 being invested in Terex stock as a result of Terex's matching decision.

[11] Company contributions are not a gift, they are earned compensation: "The participants in a pension plan are the investors even if the employer alone contributes to the plan, since, as we mentioned, there is no free lunch. An employer who had no pension obligations would pay his employees higher wages, and they would then make their own arrangements for retirement." *Steinman v. Hicks*, 352 F.3d 1101, 1104 (7th Cir. 2003).

Similarly, during the Relevant Period, at least one SPD (Document 64-1), which is a fiduciary communication, described the Fund as "invested primarily in Terex Common Stock. It is a unitized stock fund made up of company stock and, for liquidity purposes, a small portion of the Fund may also include cash or be invested in short-term liquid investments." Document 64-1, p.15 of 30.[12]

155.   As recognized by the Eleventh Circuit, "[p]rimarily does not mean exclusively; primarily exclusively means primarily." *Lanfear v. Home Depot, Inc.*, 679 F.3d 1267, 1277 (11th Cir. 2012) (abrogated in part on other grounds).   Accordingly, Defendants, in the exercise of the fiduciary duties, had discretion to invest more of the Fund assets in cash rather than Terex common stock.

156.   Defendants could have and should have directed that all Company and Participant contributions to the Terex Stock Fund be held in cash rather than be used to purchase Terex common stock.   The refusal to purchase Company stock in the Fund is not a "transaction" within the meaning of insider trading prohibitions.

157.   These actions would not have required any independent disclosures that could have had a material adverse effect on the stock price.

158.   Alternatively, Defendants should have closed the Fund itself to further contributions and directed that contributions be diverted from the Terex Stock Fund into other

---

[12] The Trust Agreement for the Plan similarly states that: "Trust investments in Sponsor Stock shall be made via the Terex Company Stock Fund (the 'Stock Fund'). Investments in the Stock Fund shall consist primarily of shares of Sponsor Stock. The Stock Fund shall also include cash or short-term Liquid investments, in accordance with this paragraph, in amounts designed w satisfy daily participant exchange or withdrawal requests. Such holdings will include Colchester Street Trust: Money Market Portfolio: Class I or such other Mutual Fund or commingled money market pool as agreed to in writing by the Sponsor and Trustee. The Named Fiduciary shall, after consultation with the Trustee, establish and communicate to the Trustee in writing a target percentage and drift allowance for such short-term liquid investments." Feb. 8, 2002 amendment at (1)(e).

(prudent) investment options based upon Participants' instructions or, if there were no such instructions, the Plan's default investment option.

**Alternative Three: Complete and Accurate Disclosure**

159. As multiple courts have recognized, "[t]he question of whether Plaintiff's losses would have been more or less significant had Defendants disclosed information earlier is inappropriate for resolution at this stage of the litigation." *Shanehchian v. Macy's, Inc.*, No. 1:07-CV-00828, 2009 U.S. Dist. LEXIS 71997, at *25 (S.D. Ohio Aug. 13, 2009); *see also In re: Goodyear Tire & Rubber Co. Erisa Litig.*, 438 F. Supp. 2d 783, 792 (N.D. Ohio 2006); *In re Ferro Corp. Erisa Litig.*, 422 F. Supp. 2d 850, 863 (N.D. Ohio 2006) ("Ferro is correct that public disclosure would have most likely caused significant losses no matter when it occurred. However, whether those losses would have been more or less significant is a speculative issue inappropriate for resolution at this early stage of the litigation.")

160. Plaintiffs believe that a less significant drop would have occurred upon an earlier disclosure. For example, it could well be that the market further discounted Terex stock based upon the withholding of Terex's disclosures for months, treating the Company as something of a "black box" because investors feared that other risks were being hidden. *See* King, R. "The Liar's Discount," *Forbes*, May 30, 1988 (suggesting that firms that obtain a reputation for being less than forthcoming about impending bad news trade at a discount to other stocks). Thus, earlier disclosures would have, contrarily, caused investors to be willing to pay more for Terex stock because they would have more comfort that management was forthright and nothing was being hidden. *Id.* ("[g]etting bad news out fast and straight is perhaps the cardinal rule of effective public relations.")

161. Plaintiffs believe that an early disclosure would have caused the stock to drop less because, among other things: it could have caused less reputational damage to the Company; it

could have allowed the Company to avoid defending and facing judgment in the securities case before the Court, and it could have put the Company at less risk of defending against other regulatory and/or governmental investigations and/or paying fines or penalties associated therewith. An earlier disclosure may have also stopped further corporate malfeasance or limited statements with respect to goodwill, backlogs, and so forth, during the Relevant Period. *See* Richard A. Booth, *Article: Class Conflict in Securities Fraud Litigation*, 14 U. PA. J. BUS. L. 701, 708-09 ("holders suffer a further loss because of the expenses suffered by the corporation in defending itself against the class action and any other enforcement proceedings (not to mention possible fines and the intangible costs of management distraction). Moreover, the corporation may suffer reputational harm that increases its cost of capital and further drives down stock price. Although buyers may recover for these losses because they are built into the total decline in stock price, they are losses suffered by all of the stockholders and not merely those who bought during the fraud period.") (footnotes and citations omitted)

**Other Alternatives Available to Defendants**

162. Defendants also could have:

- Sought guidance from the DOL or SEC as to what they should have done;

- Resigned as Plan fiduciaries to the extent they could not act loyally and prudently;

- Retained outside experts to serve either as advisors or as independent fiduciaries, or;

- Limited Participant accounts to a certain maximum account percentage being invested in Terex stock.

163. Despite the availability of these and other options, Defendants took no meaningful action to protect Participants from losses as a result of the Fund's imprudence.

## Remedy For Breaches Of Fiduciary Duty

164.     As noted above, as a consequence of the Defendants' breaches, the Plan suffered significant losses.

165.     ERISA § 502(a), 29 U.S.C. § 1132(a), authorizes a plan participant to bring a civil action for appropriate relief under ERISA § 409, 29 U.S.C. § 1109.  Section 409 requires "any person who is a fiduciary . . . who breaches any of the . . . duties imposed upon fiduciaries . . . to make good to such plan any losses to the plan . . ." Section 409 also authorizes "such other equitable or remedial relief as the court may deem appropriate . . ."

166.     With respect to calculation of the losses to a plan, breaches of fiduciary duty result in a presumption that, but for the breaches of fiduciary duty, the participants and beneficiaries in the Plan would not have made or maintained its investments in the challenged investment and, where alternative investments were available, that the investments made or maintained in the challenged investment would have instead been made in the most profitable alternative investment available.  In this way, the remedy restores the values of the Plan's assets to what they would have been if the Plan had been properly administered.

167.     Plaintiffs, the Participants, the Plan, and/or the Class are therefore entitled to relief from the Defendants in the form of: (1) a monetary payment to the Plan to make good to the Plan the losses to the Plan (on both a Plan-wide basis and an Individual Account basis) resulting from the breaches of fiduciary duties alleged above in an amount to be proven at trial based on the principles described above, as provided by ERISA § 409(a), 29 U.S.C. § 1109(a); (2) reasonable attorney fees and expenses, as provided by ERISA § 502(g), 29 U.S.C. § 1132(g), the common fund doctrine, and other applicable law; (3) taxable costs; (4) interests on these amounts, as provided by law; and (5) such other legal or equitable relief as may be just and proper.

168.    Each Defendant is jointly liable for the acts of the other Defendants as a co-fiduciary.

## COUNT I

### Failure to Prudently and Loyally Manage the Plan's Assets

### (Breaches of Fiduciary Duties in Violation of ERISA §§ 404 and 405
### Against All Defendants)

169.    Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

170.    At all relevant times, as alleged above, all Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) in that they exercised discretionary authority or control over the administration and/or management of the Plan and/or disposition of the Plan's assets.

171.    Under ERISA, fiduciaries who exercise discretionary authority or control over management of a Plan or disposition of a Plan's assets are responsible for ensuring that investment options made available to participants under a Plan are prudent.  Furthermore, such fiduciaries are responsible for ensuring that assets within the Plan are prudently invested.  Defendants were responsible for ensuring that all investments in Company stock by the Plan were prudent and that such investment was consistent with the purpose of the Plan.  Defendants are liable for losses incurred as a result of such investments being imprudent.

172.    A fiduciary's duty of loyalty and prudence requires it to disregard plan documents or directives that it knows or reasonably should know would lead to an imprudent result or would otherwise harm plan participants or beneficiaries. ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D).  Thus, a fiduciary may not blindly follow plan documents or directives that would lead to an imprudent result or that would harm plan participants or beneficiaries, nor may it allow

others, including those whom they direct or who are directed by the plan, including plan trustees, to do so.

173.    Defendants' duty of loyalty and prudence also obligates them to speak truthfully to participants, not to mislead them regarding the Plan or its assets, and to disclose information that participants need in order to exercise their rights and interests under the Plan.  This duty to inform participants included an obligation to provide the Participants and beneficiaries of the Plan with complete and accurate information, and to refrain from providing inaccurate or misleading information, or concealing material information regarding Plan investments/investment options, such that participants can make informed decisions with regard to the prudence of investing in such options made available under the Plan.

174.    Defendants breached their duties to prudently and loyally manage the Plan's assets. During the Relevant Period, Defendants knew or should have known that, as described herein, Terex securities were not a suitable and appropriate investment for the Plan.  Investment in Company securities during the Relevant Period clearly did not serve the Plan's purpose, and was clearly too risky for retirement savings.  Yet, during the Relevant Period, despite their knowledge of the imprudence of the investment, Defendants failed to take any meaningful steps to protect Plan participants from the inevitable losses that they knew or should have known would ensue as a result of the above-described problems.

175.    Defendants also breached their duties of loyalty and prudence by failing to provide complete and accurate information regarding the Company's true financial condition and the Company's disguising of the same and, generally, by conveying inaccurate information regarding the Company's future outlook, including by incorporating information by reference into SPDs when they knew or should have known such information was incorrect.  During the Relevant

Period, upon information and belief, the Company fostered a positive attitude toward the Company's stock, and/or allowed Participants in the Plan to follow their natural bias towards investment in the equities of their employer by not disclosing negative material information concerning investment in Company's stock. As such, Participants in the Plan could not appreciate the true risks presented by investments in the Company stock and therefore could not make informed decisions regarding their investments in the Plan.

176. Defendants also breached their co-fiduciary obligations by, among their other failures, knowingly participating in, or knowingly undertaking to conceal, the other Defendants' failures to: (a) adequately review the prudence of Company stock as a Plan investment and (b) take appropriate action to ensure that the Plan's assets were prudently invested by, *inter alia*, disclosing crucial information regarding the Company's operations and, instead, incorporating by reference into fiduciary communications information they knew or should have known was, at best, incomplete. Defendants had or should have had knowledge of such breaches by other Plan fiduciaries, yet made no effort to remedy them.

177. As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan and the Participants lost a significant portion of their retirement investment.

178. Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

## COUNT II

### Breach of Duty to Avoid Conflicts of Interest

### (Breaches of Fiduciary Duties in Violation of ERISA §§ 404 and 405 Against Defendants DeFeo, Barr, Cohen, Jacobs and Andersen)

179.    Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

180.    At all relevant times, as alleged above, the Defendants listed in this Count were fiduciaries within the Plan within meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). Consequently, they were bound by the duties of loyalty, exclusive purpose and prudence.

181.    ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A), imposes upon plan fiduciaries a duty of loyalty, that is, a duty to discharge their duties with respect to a plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and beneficiaries.

182.    Defendants named in this Count breached their duty to avoid conflicts of interest and to promptly resolve them by, *inter alia*: failing to timely engage independent fiduciaries who could make independent judgments concerning the Plan's investments in the Company's stock; and by otherwise placing their own and/or the Company's interests above the interests of the participants with respect to the Plan's investment in the Company's stock.

183.    Because the compensation of at least some of the Defendants named in this Count was significantly tied to the price of Terex stock, at least certain of the Defendants had an incentive to keep the Plans' assets heavily invested in Terex stock on a regular, ongoing basis. Elimination of Company stock as an investment option/vehicle for the Plans would have reduced the overall market demand for Terex stock and sent a negative signal to Wall Street analysts; both results

would have adversely affected the price of Terex stock, resulting in reduced compensation for at least certain of the defendants.

184.    Some Defendants may have had no choice in tying their compensation to Terex stock (because compensation decisions were out of their hands), but Defendants did have the choice of whether to keep the Plan participants' and beneficiaries' retirement savings invested to a large extent in Terex stock or whether to properly inform participants of material negative information concerning the above-outlined Company problems.

185.    These conflicts of interest put the Defendants named in this Count in the position of having to choose between their own interests as executives and stockholders, and the interests of the Plans participants and beneficiaries, whose interests the Defendants were obligated to loyally serve with an "eye single" to the Plans. *See generally Mertens v. Hewitt Assoc.*, 508 U.S. 248, 251-52, 124 L. Ed. 2d 161, 113 S. Ct. 2063 (1993); *Hahnemann Univ. Hosp. v. All Shore, Inc.*, 514 F.3d 300, 309 (3d Cir. 2008); 29 U.S.C. § 1104(a)(1)(B).

186.    During the Relevant Period, certain of Defendants chose to protect their own interests by selling significant personal holdings of Company stock.  Throughout the Relevant Period, Company insiders sold tens of thousands of their shares of Terex stock for proceeds of millions of dollars.

187.    For example, Committee Defendant Barr sold 14,234 shares of Company stock between March and May of 2008 for net proceeds of $949,487 and Committee Defendant Cohen sold 14,000 shares for net proceeds of $1,012,237 in May of 2008.  Additionally, Defendant Jacobs sold 10,000 shares for net proceeds of $670,053 in February of 2008 and Defendant Andersen sold 20,000 shares in March of 2008 for net proceeds of $1,310,516.

188.     As a consequence of these Defendants' breaches of fiduciary duty, the Plan suffered tens of millions of dollars in losses.  If Defendants had discharged their fiduciary duties to prudently invest and manage the Plan's assets, the losses suffered by the Plan would have been minimized or avoided.  Therefore, as a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly Plaintiffs and the Plan's other Participants and beneficiaries, lost a significant portion of their retirement investments.

189.     Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a), and ERISA § 409, 29 U.S.C. § 1109(a), the Defendants listed in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

## COUNT III

### Failure to Adequately Monitor Other Fiduciaries and
### Provide Them with Accurate Information

### (Breaches of Fiduciary Duties in Violation of ERISA § 404 Against
### Terex and the Monitoring Defendants)

190.     Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

191.     At all relevant times, as alleged above, Defendant Terex and the Monitoring Defendants were fiduciaries, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

192.     At all relevant times, as alleged above, the scope of the fiduciary responsibility of Terex and the Monitoring Defendants included the responsibility to appoint, evaluate, and monitor other fiduciaries, including, without limitation, the appointed Plan Committee and all other Company officers, employees and agents to whom fiduciary responsibilities were delegated.

193.     The duty to monitor entails both providing information to and reviewing the actions of the monitored fiduciaries.  In this case, that means that the monitoring fiduciaries, Terex and the Monitoring Defendants, had the duty to:

(a)     Ensure that the monitored fiduciaries possessed the needed credentials and experience, or use qualified advisors and service providers to fulfill their duties.  They must have been knowledgeable about the operations of the Plan, the goals of the Plan, and the behavior of the Plan's participants;

(b)     Ensure that the monitored fiduciaries were provided with adequate financial resources to do their job;

(c)     Ensure that the monitored fiduciaries had adequate information to do their job of overseeing the Plan's investments;

(d)     Ensure that the monitored fiduciaries had ready access to outside, impartial advisors when needed;

(e)     Ensure that the monitored fiduciaries maintained adequate records of the information upon which they base their decisions and analysis with respect to the Plan's investments; and

(f)     Ensure that the monitored fiduciaries reported regularly to Terex and the Monitoring Defendants.  The Company and/or the Monitoring Defendants must have then reviewed, understood, and approved the conduct of the hands-on fiduciaries.

194.     Under ERISA, a monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment of a plan's assets, and must take prompt and effective action to protect a plan and its participants when they are not.  In addition, a monitoring fiduciary must provide the monitored fiduciaries with

complete and accurate information in their possession that they know or reasonably should know that the monitored fiduciaries must have in order to prudently manage a plan and a plan's assets.

195.     Terex and the Monitoring Defendants breached their fiduciary monitoring duties by, among other things, (a) failing to ensure that the monitored fiduciaries (the Committee Defendants) had access to knowledge about the Company's business problems alleged above, which made Company stock an imprudent retirement investment; and (b) failing to ensure that the monitored fiduciaries (the Committee Defendants) completely appreciated the huge risk of significant investment of the retirement savings of rank and file employees in Company stock, an investment that was imprudent and subject to inevitable and significant depreciation.  Terex and the Monitoring Defendants knew or should have known that the fiduciaries they were responsible for monitoring (the Committee Defendants) were (i) continuing to invest the assets of the Plan in Company stock when it no longer was prudent to do so, and (ii) imprudently allowing the Plan to continue offering Company stock as an investment alternative.  Despite this knowledge, Terex and the Monitoring Defendants failed to take action to protect the Plan, and concomitantly the Plan's Participants, from the consequences of these fiduciaries' failures.

196.     In addition, Terex and the Monitoring Defendants, in connection with their monitoring and oversight duties, were required to disclose to the monitored fiduciaries (the Committee Defendants) accurate information about the financial condition of Terex that they knew or should have known that these Defendants needed to make sufficiently informed decisions.  By remaining silent and continuing to fail to disclose such information to the monitored fiduciaries, these Defendants breached their monitoring duties under the Plan and ERISA.

197.     Terex and the Monitoring Defendants are liable as co-fiduciaries because they knowingly participated in the each other's fiduciary breaches as well as those by the monitored

fiduciaries, they enabled the breaches by these Defendants, and they failed to make any effort to remedy these breaches, despite having knowledge of them.

198.     As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly the Plaintiffs and the Plan's other Participants and beneficiaries, lost a significant portion of their retirement investments.

199.     Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

## COUNT IV

### Co-Fiduciary Liability

### (Breaches of Fiduciary Duties in Violation of ERISA §§ 404 and 405
### Against all Defendants)

200.     Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

201.     This Count alleges co-fiduciary liability against all Defendants.

202.     As alleged above, during the Relevant Period the Defendants were named fiduciaries pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), or *de facto* fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), or both. Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence.

203.     As alleged above, ERISA § 405(a), 29 U.S.C. § 1105, imposes liability on a fiduciary, in addition to any liability that he or she may have under any other provision, for a breach of fiduciary responsibility of another fiduciary with respect to the same plan if it knows of a breach and fails to remedy it, knowingly participates in a breach, or enables a breach. The Defendants breached all three provisions.

204.     ERISA § 405(a)(3), 29 U.S.C. § 1105, imposes co-fiduciary liability on a fiduciary for a fiduciary breach by another fiduciary if that fiduciary has knowledge of a breach by such other fiduciary, unless it makes reasonable efforts under the circumstances to remedy the breach. Here, the Defendants knew of the breaches by the other fiduciaries and made no efforts, much less reasonable ones, to remedy those breaches.

205.     Terex, through its directors and employees, engaged in inappropriate business practices, withheld material information from the market and the Plan's Participants, provided the market and the Plan's Participants with inaccurate disclosures, and profited from such practices, and, thus, knowledge of such practices is imputed to Terex as a matter of law.

206.     The Committee Defendants, by virtue of their positions at Terex, participated in and/or knew about the Terex's problems as described herein, yet failed to undertake any effort to remedy these breaches.

207.     ERISA § 405(a)(1), 29 U.S.C. § 1105(1), imposes liability on a fiduciary for a breach of fiduciary responsibility of another fiduciary with respect to the same plan if it participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach. Terex also, as a de facto fiduciary, participated in all aspects of the fiduciary breaches of the other Defendants.

208.     ERISA § 405(a)(2), 29 U.S.C. § 1105(2), imposes liability on a fiduciary if by failing to comply with ERISA § 404(a)(1), 29 U.S.C. §1104(a)(1), in the administration of his specific responsibilities that give rise to his status as a fiduciary, he has enabled another fiduciary to commit a breach.

209.     The failure of Defendants to monitor co-fiduciaries enabled the co-fiduciaries to breach their duties.

210.     As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly Plaintiff and the other Participants, lost a significant portion of their retirement savings.

211.     Pursuant to ERISA §§ 409 and 502(a)(2), 29 U.S.C. §§ 1109(a) and 1132(a)(2) Defendants are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

## COUNT V

### To Recover Contributions Due to the Plan

### (Against Terex to the Extent It Was Not Acting as a Fiduciary When It Made Matching Decisions)

212.     Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

213.     Count V is brought recover delinquent contributions owed to the Plan by Terex.

214.     ERISA Section 502(a)(3)(B), 29 U.S.C. § 1132(a)(3)(B), allows participants to bring suit "to enforce any provisions of [ERISA] subchapter [I] or the terms of [an ERISA] plan[.]"

215.     Section 1.01 of the Plan required that "Terex Corporation shall make Matching Contributions under the Plan, on behalf of its Eligible Employees, with respect to certain Elective Contributions that are made by such employees for any pay period beginning on or after May 9, 1993" and the Plan was executed by a "duly authorized officer" of Terex.

216.     By knowingly contributing highly risky, artificially inflated employer securities (with a fair value that was less than their market price),[13] Terex skirted its responsibilities under

---

[13] *Cf. In re Greenwich Pharm. Securities Litig.*, No. 92-3071, 1995 U.S. Dist. LEXIS 5717, at *8 (E.D. Pa. April 26, 1995) (if allegations in a Rule 10b-5 case are proven true "fair value presumably will differ from the stock market price (the latter being inflated by the fraud)").

the Plan and it thus shorted the Plan and its Participants of their entitlements under Section 1.01 of the Plan. As alleged above, Terex's decision to make the matching contribution in Terex stock rather than cash was a fiduciary act and a breach of Terex's fiduciary duties. Even if, *arguendo*, Terex's decision to effect the matching contribution in Terex stock rather than cash was not a fiduciary decision, Terex is nonetheless liable for failing to provide the full value of the matching contributions promised by Section 1.01 of the Plan.

217. As a direct and proximate result of the violations of the Plan document alleged herein, the Plan, and indirectly Plaintiff and the other Participants, were deprived of a significant portion of their retirement savings.

218. Pursuant to ERISA Section 502(a)(3)(B), 29 U.S.C. § 1132(a)(3)(B), Terex is responsible for restoring the losses to the Plan caused by its artificially inflated contributions as alleged in this Count and to provide other equitable relief as appropriate.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for judgment against Defendants jointly and severally for:

A. Actual damages in the amount of any losses the Plan suffered, with such losses to be allocated among the Plan Participants' individual accounts in proportion to the accounts' losses;

B. Attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine;

C. Costs pursuant to 29 U.S.C. § 1132(g); and

D. Such other relief as the Court may deem just and proper.

## JURY TRIAL DEMAND

Plaintiffs demand trial by jury of all issues so triable.

Dated: August 7, 2014

**STULL, STULL & BRODY**

  s/Edwin J. Mills             
Edwin J. Mills[14]
Patrick Slyne (ct19975)
Michael J. Klein (ct28260)
6 East 45th Street
New York, NY 10017
Telephone: (212) 687-7230
Facsimile: (212) 490-2022

*Interim Lead Class Counsel*

Robert A. Izard (ct01601)
Mark P. Kindall (ct13797)
**IZARD NOBEL LLP**
29 So. Main Street, Suite 305
West Hartford, CT 06107
Telephone: (860) 493-6292
Facsimile: (860) 493-6290

*Interim Liaison Counsel*

**KESSLER TOPAZ
MELTZER & CHECK, LLP**
Edward W. Ciolko
Mark K. Gyandoh
Julie Siebert-Johnson
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056

**GAINEY McKENNA & EGLESTON**
Thomas J. McKenna
440 Park Avenue South
5th Floor
New York, NY  10016
Telephone: (212) 983-1300
Facsimile: (212) 983-0380

---

[14]     Admitted *pro hac vice* on February 18, 2010, Docket Entry 11.

**SHEPHERD FINKELMAN MILLER & SHAH, LLP**
James E. Miller (ct21560)
Patrick A. Klingman (ct17813)
Karen M. Leser-Grenon (ct23587)
65 Main Street
Chester, CT 06412
Telephone: (860) 526-1100
Facsimile: (860) 526-1120
jmiller@sfmslaw.com
pklingman@sfmslaw.com
kleser@sfmslaw.com

**WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP**
Mark C. Rifkin
Martin E. Restituyo
270 Madison Ave.
New York, NY 10016
Telephone: (212) 545-4600
Facsimile: (212) 545-4653

**BOTTINI & BOTTINI, INC.**
Francis A. Bottini, Jr.
Albert Y. Chang (*pro hac vice*)
7817 Ivanhoe Avenue, Suite 102
La Jolla, California 92037
Telephone:  (858) 914-2001
Facsimile: (858) 914-2002

*Attorneys for Plaintiffs*

**Certificate of Service**

I hereby certify that on August 7, 2014, a copy of foregoing Consolidated Amended Complaint was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the court's CM/ECF System.

  s/Edwin J. Mills

Edwin J. Mills[15]

**STULL, STULL & BRODY**

6 East 45th Street

New York, NY 10017

Telephone: (212) 687-7230

Facsimile: (212) 490-2022

---

[15] Admitted *pro hac vice* on February 18, 2010, Docket Entry 11.